**BAGGETT TRANSPORTATION COMPANY, Birmingham, Alabama, Tri-State Motor Transit Company, Joplin, Missouri, and C. I. Whitten Transfer Co., Huntington, West Virginia, Petitioners,**

**v.**

**UNITED STATES of America and Interstate Commerce Commission, Respondents.**

**Nos. 81–7248, 81–7550 to 81–7552 and 81–7619 to 81–7621.**

United States Court of Appeals, Eleventh Circuit.

Jan. 25, 1982.

Rehearing Denied March 1, 1982.

William G. Somerville, Birmingham, Ala., for all petitioners.

Mel P. Booker, Jr., Alexandria, Va., for Baggett Transp. Co.

Max G. Morgan, Edmond, Okl., for Tri-State.

J. G. Dail, Jr., McLean, Va., for C. I. Whitten.

Robert B. Nicholson, Nancy C. Garrison, Susan J. Atkinson, Dept. of Justice, Edward O'Meara, ICC, Washington, D. C., for respondents.

Donald E. Cross, Washington, D. C., for intervenor Riss Internat'l Corp.

Alan Foss, Fargo, N. D., for intervenor International Transport, Inc.

Stanley E. McCormick, Elliott Bunce, Arlington, Va., for intervenor Ryder Truck Lines, Inc.

E. Larry Wells, Edwin M. Snyder, Dallas, Tex., for intervenor T.I.M.E.–DC, Inc.

Guy H. Postell, Atlanta, Ga., for intervenor Superior Trucking Co., Inc.

Turney & Turney, Robert E. Campbell, William O. Turney, Washington, D. C., for intervenor Leonard Brothers Trucking Co., Inc.

J. Michael May, Marietta, Ga., for intervenor Home Transp. Co., Inc.

Before TUTTLE, HILL and JOHNSON, Circuit Judges.

TUTTLE, Circuit Judge:

These are petitions by Baggett Transportation Company and other protesting present carriers to set aside the grant of common carrier authority to transport explosives to the seven applicants for licenses by the Interstate Commerce Commission.

The petitioners attack the Commission's orders on the ground that there was insufficient factual basis in the record to permit the Commission to determine that the proposed operations would serve a useful public purpose, responsive to a public demand or need; that there was insufficient evidence to permit the Commission to ignore the effect of the granting of the orders on the present carriers; that the Commission failed to make findings, supported by substantial evidence, on certain specified goals of the National Transportation Act; and that it was an abuse of discretion for the Commission to fail to consolidate these seven and five other pending applications for similar licenses while they were being considered by the Commission.[1]

## I. LEGAL FRAMEWORK

Prior to the adoption by Congress of the Motor Carrier Act of 1980, Pub.L.No. 96–296, 94 Stat. 793, the controlling statutory standard which controlled the Commission in licensing motor carriers was that the proposed service "be required by the present or future public convenience and necessity." 49 U.S.C. § 10922 (1978 Supp. ii). Under the new statute, Section 10922(b)(1) and (2) now instruct the Commission with respect to the granting of such licenses. These sections provide as follows:

(1) Except as provided in this section, the Interstate Commerce Commission shall issue a certificate to a person authorizing that person to provide transportation subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title as a motor common carrier of property if the Commission finds—

(A) that the person is fit, willing, and able to provide the transportation to be authorized by the certificate and to comply with this subtitle and regulations of the Commission; and

(B) on the basis of evidence presented by persons supporting the issuance of the certificate, that the service proposed will serve a useful public purpose, responsive to a public demand or need;

unless the Commission finds, on the basis of evidence presented by persons objecting to the issuance of a certificate, that the transportation to be authorized by the certificate is inconsistent with the public convenience and necessity.

(2) In making a finding under paragraph (1) of this subsection, the Commission shall consider and, to the extent applicable, make findings on at least the following:

(A) the transportation policy of section 10101(a) of this title; and

(B) the effect of issuance of the certificate on existing carriers, except that the Commission shall not find diversion of revenue or traffic from an existing carrier to be in and of itself inconsistent with the public convenience and necessity.

49 U.S.C. § 10922(b)(1) and (2).

It will thus be seen that the primary obligation of the applicant is to satisfy the

---

1. The authority granted to each applicant involved in this proceeding was for a period of five years. The separate authorizations are attached to this opinion as "Annex A."

Commission that it is fit, willing and able to provide the service and that the service proposed will "serve a useful public purpose, responsive to a public demand or need." Thereupon, the burden shifts to any protestant to persuade the Commission that "on the basis of evidence presented by persons objecting to the issuance of [the] certificate, the transportation to be authorized by the certificate is inconsistent with the public convenience and necessity." Because of the reference under (2)(A) above to the transportation policy of Section 10101(a) we find that the following provisions of Section 10101(a) are relevant to this discussion. They provide as follows:

(7) With respect to transportation of property by motor carrier, to promote competitive and efficient transportation services in order to

(A) meet the needs of shippers, receivers, and consumers . . .

(C) allow the most productive use of equipment and energy resources

(D) enable efficient and well managed carriers to earn adequate profits, attract capital, and maintain fair wages and working conditions. . . .

(F) improve and maintain a sound, safe, and competitive privately owned motor carrier system.

## II. FACTS OF RECORD IN THESE CASES

While the facts in these several cases on appeal differ somewhat, they are alike in sufficient respects to permit us to deal with them in a single opinion. At a minimum, as shown in the record of the application of Riss International Corporation, on appeal here under No. 81–7248, we find the following factual basis on which the Commission made its order: The sworn application of Riss, supported by the sworn certification of Shipper Support by the Military Traffic Management Command of the Department of Defense, executed by the director of Inland Traffic of MTMC.

The record also included an application to intervene by Tri-State Motor Transit Company as a protestant to the application;

protest of American Farm Lines, Inc. to the application; and protest of Baggett Transportation Company to the application. Some of the same protestants, but not all of them, filed in opposition to one or more of the other applicants whose licenses are attacked by this appeal.

## III. THE PRIMA FACIE CASE

The applications, without exception, so clearly supported the Commission's determination that the applicants were "fit, willing and able" that we find any objection to the Commission's action based on this factor purely frivolous. The applicants all showed considerable authority under existing certificates to transport similar commodities. They showed knowledge of, and ability to comply with, the particular requirements of handling hazardous cargo, and for the most part they showed current ownership of the type of equipment necessary for this type of transportation. There can be no doubt about the fitness, ability and willingness of these applicants, as determined by the Commission.

We turn next to the question whether there was sufficient evidence presented by persons supporting the issuance of the certificates to permit the Commission to determine "that the service proposed will serve a useful purpose, responsive to a public demand or need." The protestants take the bald position that the support given by MTMC and, in one case, by a private commercial shipper of explosives, was totally insufficient to permit a finding on this issue favorable to the applicants. For their part, the applicants point to the significant change in policy motivating Congress in enacting the Transportation Act of 1980 which, admittedly, makes much easier an entry into the motor carriage business than was possible under the old law. Without reference to the legislative history, it is plain that the burden borne by a person seeking certification is now much less than formerly, when such an applicant was required to show that his entry was required by "public convenience and necessity." Now, the burden on the applicant is to show

"that the service proposed will serve a useful purpose, responsive to a public demand or need." Thereafter, the burden shifts to any protestant to convince the Commission "that the transportation to be authorized by the certificate is inconsistent with the public convenience and necessity."

The MTMC support for each of the applicants was substantially the same. It contained the following responses to inquiries on the Verified Certification of Shipper or Witness Support form furnished by the Commission:

(3) General description of business entity:

The DOD has designated MTMC as the Single Manager Operating Agency for military traffic, land transportation and common-user ocean terminals. MTMC is responsible for the direction, control and supervision of all functions incident to the effective and economical procurement and use of freight transportation services from commercial transportation companies. The primary function of MTMC includes providing traffic management support for the movement of Defense freight within the continental United States.

(4) Description of commodities which would be transported under the sought operating authority. (Not applicable in passenger applications):

Classes A & B Ammunition, Explosives, Weapons, and Articles designated sensitive by the US Government between all points in the United States. (This application duplicates, in part, authority presently held by applicant.)

(5) Amount of traffic that would be tendered to applicant if the application were granted. (Number of trips in passenger applications.)

DOD policy prohibits guarantees of tonnage. Applicant's participation in freight movements will be dependent on its ability to provide satisfactory service at the lowest overall cost.

(6) Representative origins and destination of supporting shipper's traffic (or trips in passenger c [sic]

| From | To | |
|------|-----|---|
| 1. Anniston, AL | Charleston, SC | |
| 2. Huntsville, AL | Crane, IN | |
| 3. Kimbus, LA | Letterkenny, PA | This is a very repre- |
| 4. Marion, IL | Romulus, NY | sentative listing. Ship- |
| 5. Hawthorne, NV | Yuma, AZ | ments could oc [sic] be- |
| 6. Savannah, OK | Ft. Riley, KS | tween virtually every |
| 7. Kingsport, TN | Haywood, OK | DOD installation. |

(7) Transportation services now employed by shipper or passengers (if any):

During the period thru November 1979, approximately 223 carriers, including applicant, were used to transport the type commodities noted in Item 4 above.

. . .

(9) Any specific or specialized service needs:

Special services required of the carrier could include Signature Security Services, Constant Surveillance Service and Dual Driver Protective Service. Other services may be required at the discretion of the shipping activity to protect shipments in transit and at terminals.

(10) Any other information:

Although there are presently a number of common carriers providing this type service, the Department of Defense is supporting this application as part of its continuing efforts to increase competition, lower costs, improve service and promote energy conservation. Severe budget cuts in DOD funds allocated to the procurement of transportation have intensified our need to obtain responsive service at minimal costs. Applicant has been advised that its participation in DOD traffic is contingent on its ability to achieve the goals stated above.

The Commission had before it in the records of these cases evidence from which it could conclude that, although there were some 232 different carriers that had participated to some extent in the carriage of these commodities, there were only four or five that could compete on a nationwide basis.

Much of the protestant's criticism of the Commission's findings here is based upon the failure of the supporting shipper, the

MTMC to satisfy some of the guidelines that had previously, before the enactment of the 1980 Act, been required under the teachings of *Novak Contract Carrier Application*, 103 MCC 555 (1967). It is clear that whatever may have been the requirement prior to the 1980 Act, the *Novak* guidelines were no longer in effect at the time of these decisions. This is made clear by *Pre-Fab Transit Co. Ext.-Nationwide Gen. Co. Mod.*, 132 MCC 409 (1981). In that decision, the Commission made it clear that under the new Act considerably less than the *Novak*-type criteria are now required. The Commission stated:

> [W]e believe the new act was designed with elasticity to prevent, in part, the rigid application of standards that would frustrate *Congress' intent to promote competitive and efficient transportation services*. Accordingly, while it may be useful to provide guidelines to contour the decisional process, we should not attempt to set out standards for mechanically deciding if a threshold case has been made.

*Id.* (emphasis added.)

The Commission's orders in all of these cases made substantially the same findings of fact:

> *We find*:
> Performance by applicant of the service described in the appendix will serve a useful public purpose, responsive to a public demand or need. Applicant is fit, willing, and able properly to perform the granted service and to conform to the requirements of Title 49, Subtitle IV, U. S. Code, and the Commission's regulations. This action will not significantly affect either the quality of the human environment or conservation of energy resources. An appropriate certificate should be granted.

The parties agree that the standard of review of the Commission's order is that described in Section 706 of the Administrative Procedure Act, 5 U.S.C. § 706. On the facts disclosed above, so far as deals with the establishment of the prima facie case, we are convinced that the Commission's or-

ders are not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and that they were not unsupported by substantial evidence, the standard of review described by Section 706 of the Administrative Procedure Act, 5 U.S.C. § 706. *See Chem-Haulers, Inc. v. United States*, 536 F.2d 610 (5th Cir. 1976); *Miller Transport, Inc. v. United States*, 594 F.2d 463 (5th Cir. 1979) and *Refrigerated Transport Co., Inc. v. Interstate Commerce Commission*, 616 F.2d 748 (5th Cir. 1980). Without in any way deciding that shipper support which merely endorses an application, without more, satisfies the useful public purpose standard under the statute, we conclude that the Department of Defense does considerably more than that in these cases and we conclude, furthermore, that the Department of Defense is not just any shipper. We take judicial notice of the fact that in seeking additional carriers equipped to handle the transportation of dangerous explosives to and from its military facilities within the continental United States, MTMC is in a unique position. Its position is unique both as an agency for the conduct of the national defense and also as an agency which expends public monies. Both of these circumstances give weight to its request for the licensing of additional shippers in order to increase the possibility of competition and obtain the lowest effective transportation costs. We conclude that the applicant carried its burden of making its prima facie case.

## IV. THE PROTESTANTS' CASE

As we have already noted, once the applicant has made its prima facie case, the burden shifts to any protestant to persuade the Commission that "on the basis of evidence presented by persons objecting to the issuance of [the] certificate, the transportation to be authorized by the certificate is inconsistent with the public convenience and necessity." We therefore look to the protests filed by the petitioners here, and the underlying documents upon which they base their contention that the Commission erred in not finding that the granting of

the certificates were in fact inconsistent with the public convenience and necessity.

It is plain that on the basis of the protests and supporting documents, the Commission could have found that some four nationwide carriers, including the three protesting parties here, carried some fifty percent of the specified commodities on behalf of the Department of Defense during recent years. The Commission could also have found that the carriage of these commodities counted for a very substantial part of the revenues of the protestants. The Commission could also have found that more than 200 other carriers were engaged in carrying part of these commodities. In its discussion of the facts, the Commission said in the *Riss* case, No. 81–7248: "Protestants' fears of diversion of government traffic appear exaggerated in view of the large number of carriers which MTMC uses. On balance, we do not believe that protestants have met their burden of demonstrating that a grant here would be inconsistent with the public convenience and necessity." In the Ryder Truck Lines, Inc. application, No. 81–7551, the Commission said:

> The predominant concern expressed by protestants is that a grant of the application will enable applicant to divert the traffic they now transport within the proposed service area. A diversion of revenue or traffic, however, in and of itself, is not regarded by the terms of the Motor Carrier Act of 1980 to be inconsistent with the public convenience and necessity, and protestants have not presented concrete evidence that their overall operations will be affected contrary to the public interest. However, there is reason to think that diversion from protestants would be minimal, as shipper is currently using the services of 223 carriers and has not expressed a desire to discontinue these services.

In each of the other applications, the Commission discussed the complaint of protestants based on their fear that a substantial part of their present traffic would be diverted, and made similar conclusions to those quoted above. Under the standard of

review applicable to such determinations by the Commission, we cannot reverse its determination that these potential diversions do not cause the grant of the applications to be inconsistent with the public convenience and necessity. Arriving at this conclusion, we note particularly the part of subsection 2(B), quoted above, which says that "the Commission shall not find diversion of revenue or traffic from an existing carrier to be in and of itself inconsistent with the public convenience and necessity." We cannot say that, in light of the record before it, the Commission did not make an adequate finding as to "the effect of issuance of the certificate on existing carriers."

■ The transportation policy of Section 10101(a), as quoted above, provides that:

> ... it is the policy of the United States government to provide for the impartial regulation of the modes of transportation subject to this subtitle, and in regulating those modes—
>
> (7) With respect to transportation of property by motor carrier, to promote competitive and efficient transportation services in order to
>
>> (A) meet the needs of shippers, receivers, and consumers ...
>>
>> (C) allow the most productive use of equipment and energy resources
>>
>> (D) enable efficient and well managed carriers to earn adequate profits, attract capital, and maintain fair wages and working conditions....
>>
>> (F) improve and maintain a sound, safe, and competitive privately owned motor carrier system.

Protestants attack the action of the Commission here because they say it was incumbent on the Commission to make specific findings with respect to each of the specified concerns that the transportation policy requires it to consider.

It must be obvious to all that some of the aims included in subparagraph (7) of Section 10101(a) are basically inconsistent. For instance, conceivably the needs of shippers, receivers and consumers might well require a doubling of the number of exist-

ing carriers; allowing the most productive use of equipment of an applicant might inevitably cause much deadheading by existing carriers; the diversion of any traffic from existing carriers may result in their no longer being "well managed carriers [able to] earn adequate profits, attract capital, and maintain fair wages and working conditions;" to be truly competitive a privately owned motor carrier system might jeopardize the complete safety of some of the competing carriers. It is self evident, therefore, that Congress has placed upon the Commission the task of weighing and balancing all of these requirements in making its separate decisions. In some of the cases the Commission commented on the failure of the protestants to show accurately how their financial structures would be adversely affected by any diversion. In others, the Commission commented on the exaggeration by protestants of potential diversions in light of the existence of the 232 carriers already being used by the DOD.

It is in making such judgment calls, where there is need for the broad overview of the whole motor carrier system, that the expertise of the Commission is needed. Once exercised, the courts may not lightly disregard it.

> The Commission's conclusion that consumer benefits outweighed any adverse impact upon the existing carriers reflects the kind of judgment that is entrusted to it, a power to weigh the competing interests and arrive at a balance that is deemed "the public convenience and necessity." *United States v. Pierce Auto Lines,* 327 U.S. 515, 535–536 [66 S.Ct. 687, 697–98, 90 L.Ed. 821] (1946). If the Commission has "drawn out and crystallized these competing interests [and] attempted to judge them with as much delicacy as the prospective nature of the inquiry permits." *ICC v. J–T Transport Co.,* 368 U.S. 81, 89 [82 S.Ct. 204, 209, 7 L.Ed.2d 147] (1961), we can require no more. Here the Commission identified the competing interests. We cannot say that the balance it struck was arbitrary or contrary law.

*Bowman Transportation, Inc. v. Arkansas Best Freight System, Inc., et al.,* 419 U.S. 281, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974).

In the *Bowman* case the Court's opinion indicated that the Commission had found that, with the exception of one carrier, none would be "seriously adversely affected" and it then concluded that in any event "the gain to be derived by the shipping public in general far outweigh any adverse effect this carrier or any other protestant may experience." The findings in the petitions before us are quite similar to these.

We conclude that the Commission's action in these cases cannot be overruled under the standard of review open to us.

## V. FAILURE TO CONSOLIDATE CASES

After one of the orders had been entered in these cases by the Commission, a motion was made by one of the protestants that the Commission consolidate these and several other pending applications. The Commission declined to do so, largely on the ground that the time element as prescribed in the statute would not permit the handling of all of the cases under such strictures. Protestants urge here that the failure to consolidate, and thus consider the effect of all of the applications in connection with the diversion of the business of the protestants was such fatal error that we should set aside the Commission's orders on that ground alone. Obviously, it would have been much simpler for the cases to have been consolidated if such a procedure had been an option available to the Commission. We do not doubt that it could have done so had it exercised that option. Nevertheless, it is clear that the protestants indicated in their documents the existence of other applications beyond the particular one in which the protest was lodged. Moreover, in light of the Commission's reliance upon the fact that the DOD had utilized the 232 carriers to handle this traffic, even the entry of all seven of these parties could well be found by the Commission not seriously to affect the volume of traffic expected by the protestants.

The determination by the Commission whether or not to consolidate the cases was a matter of complete Commission discretion. We cannot conclude that it so abused that discretion as to require the setting aside of its orders.

The Commission's orders are in all respects AFFIRMED.

The mandate shall issue forthwith.

## ANNEX A

## AUTHORITIES GRANTED TO EACH APPLICANT INVOLVED IN THIS PROCEEDING *

### 81–7248 Riss International

To operate as a *common carrier*, by motor vehicle, in interstate or foreign commerce, over irregular routes, transporting *classes A and B explosives, ammunition, weapons, and articles designated sensitive by the United States Government*, between points in the United States, restricted to the transportation of traffic moving (1) on Government bills of lading, or (2) on commercial bills of lading containing endorsements approved in *Interpretation of Govt. Rate Tariff–Eastern Central*, 323 I.C.C. 347 (1964).

### 81–7550 International Transport

To operate as a *common carrier*, by motor vehicle, in interstate or foreign commerce, over irregular routes, transporting *explosives, weapons, and articles designated sensitive by the United States Government*, between points in the United States, (including Alaska, but excluding Hawaii), restricted to the transportation of traffic moving (1) on Government bills of lading, or (2) on commercial bills of lading containing endorsements approved in *Interpretation of Govt. Rate Tariff–Eastern Central*, 323 I.C.C. 347 (1964).

### 81–7551 Ryder Truck Lines

To operate as a *common carrier*, by motor vehicle, in interstate or foreign commerce,

over irregular routes, transporting *classes A, B, and C explosives, blasting materials and supplies, ammunition, and component parts of ammunition*, between points in the United States.

### 81–7552 T.I.M.E.–DC

To operate as a *common carrier*, by motor vehicle, in interstate or foreign ·commerce, over irregular routes, transporting *classes A and B explosives*, between the facilities of Naval Weapons Support Center, at Crane, IN, Red River Army Depots, at Texarkana, TX, Louisiana Army Ammunition Plant, at Shreveport, LA, Kansas Army Ammunition Plant, at Parsons, KS, Military Ocean Terminal, at Southport, NC, and Milan Army Ammunition Plant, at Milan, TN, on the one hand, and, on the other, points in the United States.

### 81–7619 Superior Trucking

To operate as a common carrier, by motor vehicle, in interstate or foreign commerce, over irregular routes, transporting for or on behalf of the United States Government, *Classes A, B, and C, explosives, blasting supplies, blasting agents, and blasting materials, weapons and ammunition, including those designated sensitive by the United States Government, and components [sic] parts and ingredients used in the manufacture of ammunition and explosives*, between points in the United States.

### 81–7620 Leonard Bros.

To operate as a *common carrier*, by motor vehicle, in interstate or foreign commerce, over irregular routes, transporting *classes A and B explosives, and weapons and ammunition* which are designated sensitive by the United States Government, between points in the United States (except Alaska and Hawaii).

### 81–7261 Home Transportation

To operate as a *common carrier*, by motor vehicle, in interstate or foreign commerce,

---

* In accordance with usual Commission policy regarding the movement of class A and B explosives, each authority—to the extent it au- thorizes transportation of those classes—was limited to a period of five years from the date of the certificate's issuance.

over irregular routes, transporting (1) *classes A and B explosives,* (2) *ammunition, weapons and articles designated sensitive by the United States Government,* (3) *sources special nuclear and byproduct materials, radioactive materials, shipping containers, nuclear equipment and parts, and materials and supplies* used in the handling, processing, or treatment of radioactive materials, between points in the United States (including Alaska but excluding Hawaii).