STEERE TANK LINES, INC., Petitioner,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents.

No. 81–4328.

United States Court of Appeals,
Fifth Circuit.

Dec. 27, 1982.

Hugh T. Matthews, Dallas, Tex., for petitioner.

Laurence H. Schecker, I.C.C., Robert B. Nicholson, James H. Laskey, U.S. Dept. of Justice, Washington, D.C., for respondents.

Leroy Hallman, Dallas, Tex., for intervenor Chemical Exp.

Before RUBIN, RANDALL and JOLLY, Circuit Judges.

RANDALL, Circuit Judge:

The issue presented on this appeal is what meaning must be accorded the words "reasonably broaden" in section 6 of the Motor Carrier Act of 1980, 49 U.S.C. § 10922(h)(1)(B)(i) (Supp. IV 1980). In *American Trucking Associations, Inc. v. ICC*, 659 F.2d 452, 464 (5 Cir.1981), *clarified and enforced through mandamus*, 669 F.2d 957 (5th Cir.1982), *petition for cert. filed*, 51 U.S.L.W. 3014 (U.S. July 16, 1982) (No. 82–86), we held that " 'reasonable' implies that the broadening must be rational, logically supportable and fair," but the application of this test in the context of a specific case remains a problem of first impression.[1]

Common motor carriers under the jurisdiction of the Commission have always been required to obtain certificates of "public convenience and necessity" for every route they serve. *See* 49 U.S.C. § 10922(b)(1). Since existing carriers were entitled to intervene in any application for a new certificate, thereby rendering the proceedings time-consuming and expensive, the most practical option for a new carrier—or for an old one desiring to expand its operations into a new market—was to reach an informal accommodation with competitors.[2] The great majority of the certificate applications under the pre-1980 scheme were therefore unopposed. But a price was nonetheless exacted. In return for being allowed to proceed without opposition, a carrier had to apply for as narrowly drawn a certificate as possible: certificates were commonly granted for the transport of *one* product (e.g., "silica gel catalyst, in bulk") from *one* factory or small town (e.g., Lake Charles, Louisiana) in *one* direction to another small town (e.g., to but not from Scottsbluff, Nebraska). *Chemical Express Carriers, Inc.*, No. MC–124236, Sub. 39, at 13 (ICC Div. 1 Dec. 2, 1974). The result of this system was, in the judgment of many, a patchwork-quilt of illogically drawn certificates and inefficient service.[3]

To remedy this problem, section 6 of the Motor Carrier Act of 1980 provided for certain "restriction removals," so that, for example, the above certificate for the transport of silica gel catalyst in bulk from Lake Charles to Scottsbluff could arguably be "reasonably broadened" to provide authorization for shipment of "commodities in bulk" roundtrip "[b]etween points in Calcasieu Parish, Louisiana, on the one hand,

1. For an explanation of why, and the extent to which, this case is one of first impression, see note 9, *infra*.

2. Senator Cannon, the principal cosponsor of the Motor Carrier Act in the Senate, commented in his prepared introductory remarks:

   [I]n order to minimize protests from other truckers, and hence reduce the length and costliness of the application procedure, applicants for new operating authority are encouraged by the ICC itself to apply for very narrow authority .... In fact, if there are protests [from other carriers], the ICC orders the applicant to meet with protestants in order to negotiate away the areas of protest.

   As a result, most grants of new authority offer the right to provide only very limited trucking services.

   126 Cong.Rec. S3633 (daily ed. Apr. 15, 1980).

3. The Senate cosponsor of the new Act noted:

   Anyone who has looked in any detail at the existing patchwork-quilt system of motor carrier certificate authority in this country would be appalled. There are so many narrowly written operating authorities in this country due to excessive protective pressure from competitors. This simply does not make sense.

   126 Cong.Rec. S3633 (daily ed. Apr. 15, 1980) (remarks of Sen. Cannon).

and, on the other, points in Scotts Bluff County, Nebraska." *Chemical Express Carriers, Inc.,* No. MC–124236, Sub. 111, at 7 (ICC June 12, 1981) (abbreviations expanded). Steere Tank Lines, Inc., which opposes the foregoing restriction removal, vigorously argues that the statutory provision for "reasonable" broadening [4] does not authorize the Commission to turn a certificate for "silica gel catalyst" in bulk into one for the carriage of *any* "commodity in bulk," even though the carrier holds numerous other certificates for a variety of commodities in bulk. The Commission, in this instance on behalf of Chemical Express Carriers, Inc., just as vigorously urges that the statute contemplates precisely this kind of restriction removal. For the reasons set out below, we agree with the Commission and so affirm its order.

## I

Steere is a relatively large Dallas-based carrier that specializes in bulk transport throughout the southwest. Chemical Express, on the other hand, appears to be a smaller carrier whose primary strength is in the Texas intrastate market.

Chemical Express began these proceedings on April 3, 1981, when it filed a restriction removal application with the Interstate Commerce Commission. It sought to change fifty-six narrowly drawn certificates into certificates for the carriage of three broad categories of goods—building materials, commodities in bulk, and chemicals and related products. Notice of the application was duly published in the Federal Register, 46 Fed.Reg. 24,019 (1981), and Steere filed its objections within the prescribed time. Chemical Express argued that the requested restriction removals were necessary to carry out the statutorily mandated goals of the Motor Carrier Act, namely, improved service to the public, greater energy efficiency, and better use of

existing equipment and facilities. Steere argued just as vigorously that Chemical Express would take business away from Steere, thereby reducing efficiency and perhaps eliminating service to small towns entirely.

The Commission's Restriction Removal Board decided on June 12, 1981, that Chemical Express's application should be granted in its entirety, *Chemical Express Carriers, Inc.,* No. MC–124236, Sub. 111 (ICC June 12, 1981), and Steere responded by filing the present suit on August 21, 1981. The case comes directly to this court pursuant to 28 U.S.C. §§ 2321, 2341–2349 (1976 & Supp. IV 1980). The parties have essentially agreed that the facts are not in real dispute and that the outcome of the case depends upon the meaning that we are to give to the applicable provisions of the Motor Carrier Act of 1980. We therefore turn first to the statute and then to the record in this case.

## II

■ We begin, of course, with the statutory command that the Commission shall "reasonably broaden" existing certificates. MCA § 6, 49 U.S.C. § 10922(h)(1)(B)(i). Although we held in *American Trucking* that "reasonable" in this context means "rational, logically supportable and fair," we also conceded that "[t]he very use of this broad qualitative measure indicates that the effort to redefine it may result only in semantic rephrasings of the problem." 659 F.2d at 464. We therefore look to the enacted declarations of "Congressional Findings" and "National Transportation Policy" and to the legislative history for further guidance in interpreting the statute.

According to the text of the Act, Congress passed the Motor Carrier Act because it found that "historically the existing regulatory structure has tended in certain circumstances to inhibit market entry, carrier

---

**4.** The statute provides:

Not later than 180 days after the date of enactment of this subsection, the Commission shall ... implement, by regulation, procedures to process expeditiously applications of individual motor carriers of property seek-

ing *removal of operating restrictions in order to ... reasonably broaden the categories of property authorized by the carrier's certificate or permit.*
MCA § 6, 49 U.S.C. § 10922(h)(1) (subsection paragraphing deleted and emphasis added).

growth, maximum utilization of equipment and energy resources." MCA § 3(a), 49 U.S.C. § 10101 n. (Supp. IV 1980) (section entitled Congressional Findings). Congress thus clearly hoped to replace the existing system with a more logical one based on good sense and sound transportation policy. Still, as Steere has repeatedly reminded us, the Act effected a compromise between those with an interest in keeping the then present system and those who wanted complete deregulation. The institution of the new was not to mean the total abolition of the old. The enacted text also warned the Commission that "legislative and resulting changes should be implemented with the least amount of disruption to the transportation system consistent with the reforms enacted." MCA § 3(a), 49 U.S.C. § 10101 n. (Supp. IV 1980). This balance between the old and the new, between continued regulation and deregulation, is also reflected in the Act's first permanent addition to the United States Code: section 4 states, on the one side, that competition and efficiency are the main goals of the Act, and on the other side, that existing carriers are still to be protected so that they may continue to "earn adequate profits." MCA § 4(3), 49 U.S.C. § 10101(a)(7). We could not, with any fairness to the litigants before us today, claim that these equivocal and partly conflicting statements are enough to dispose of the case.

We therefore look to the legislative history for further help in determining the meaning of the words "reasonably broaden." We do so with certain misgivings. This court has already had occasion to remark upon the need for caution in relying on the legislative commentary found in the history of this Act. *See American Trucking, supra,* at 459. We think, however, that the history sheds enough light on the case to enable us to rule in favor of the Commission.

Insofar as the present case is concerned, the original bill presented by President Carter to Congress provided for *complete* deregulation. Truckers were to be allowed to transport any commodities they wished, no matter how restrictive their original certificates. *See* Trucking Competition and Safety Act of 1979, S. 1400, 96th Cong., 1st Sess. § 102 (1979), *Economic Regulation of the Trucking Industry: Hearings before the [Senate] Comm. on Commerce, Science, and Transportation . . . on . . . S. 1400,* 96th Cong., 1st Sess. pt. 2, at 262 (1979). This radical solution to the problem was, however, quickly abandoned.

The next proposal, which was ultimately enacted, was a carefully worked out compromise between those who opposed complete deregulation and those who favored it. *See, e.g., Economic Regulation of the Trucking Industry: Hearings before the [Senate] Comm. on Commerce, Science, and Transportation . . . on S. 2245,* 96th Cong., 2d Sess., pt. 5, at 1450 (1980) (introductory remarks of Sen. Cannon, cosponsor of the bill). Both the House and the Senate versions contained identical restriction removal provisions. The bill originally provided the Commission with the authority to "broaden the categories of commodities authorized by the carrier's certificate," S. 2245, 96th Cong., 2d Sess. § 6 (1980), 126 Cong.Rec. S3576, S3579–80 (daily ed. Apr. 15, 1980), but the Senate committee reporting the bill amended it to read, "*reasonably* broaden the categories of commodities authorized by the carrier's certificate *or permit.*" *Id.* (noting the two additions) (emphasis added). *See also* S.Rep. No. 641, 96th Cong., 2d Sess. 61 (1980) (also setting out the revised text of § 6). The House version of the bill was reported out of committee a little over two months later, and exactly[5] reproduced the text of the revised Senate bill, with its two minor additions. H.R. 6418, 96th Cong., 2d Sess. § 6 (1980), 126 Cong.Rec. H5355–56 (daily ed. June 19, 1980). *See* H.R.Rep. No. 1069, 96th Cong., 2d Sess. 81 (1980) (setting out the revised text of § 6). Although the legislative history does not say, the word "reasonably" appears to have been added in an attempt to restrict the Commission's authority, and thus prevent it from doing either everything or nothing. A middle ground was sought. *Cf.* 126 Cong.Rec. H5345 (daily ed. June 19, 1980) (remarks of

---

**5.** The only change was a technical one from the word "commodity" to "property."

Rep. Harsha) ("The finished product, H.R. 6418, is a very delicate and, I might add, a very good compromise. It was reached only after many long hours of tough negotiations with the Senate, the administration, and many interested parties"). Our task, then, is to determine how far Congress intended the Commission to go in broadening existing certificates that everyone, including Steere, concedes are too narrow.

The most salient fact about restriction removal is that even though it was one of the three or four most controversial and hotly debated portions of the Act, *see* 126 Cong.Rec. S3586 (daily ed. Apr. 15, 1980) (remarks of Sen. Cannon, cosponsor of the bill) ("These four keys—entry, antitrust immunity, ratemaking, and restriction removal—are the guts of this bill."), no one seems to have inquired into the precise meaning of the command, "reasonably broaden." The Secretary of Transportation, Neil Goldschmidt, seems to have anticipated only that restrictions would be "end[ed]" or "remov[ed]," without indicating that a line would have to be drawn somewhere; similarly, the Chairman of the Interstate Commerce Commission seemed primarily concerned with procedures, rather than with the substantive interpretation that was to be given to the statutory standard. *See Hearings on S. 2245,* pt. 5, *supra,* at 1586 (comments of Secretary Goldschmidt on § 6); *id.* at 1506, 1857 (comments of ICC Chairman Gaskins on § 6). The resulting House and Senate committee reports [6] reflect precisely the same degree of optimism with respect to the prospect of eliminating the irrational restrictions in the old certificates, but again there is no clear guidance for the Commission or this court in determining the scope of the substantive standards. *See* S.Rep. No. 641, *supra,* at 7, 25

(merely tracking the statutory language); H.R.Rep. No. 1069, *supra,* at 3, 17–18, *reprinted in* 1980 U.S.Code Cong. & Ad.News 2283, 2285, 2299–300 (same).

The extensive floor debates in both houses are a little more helpful. The following colloquy between the Democratic and Republican managers of the Senate bill provides the basis, we think, for the only truly responsible approach to the problem:

> Sen. Cannon: [T]he grants of authority under the new law should not continue to be the extremely narrow geographic and commodity grants that are noted throughout the hearing record. Under the restriction removal section, existing carriers have the opportunity to rationalize their operating authority and [should] be able to serve wider areas and carry more commodities. . . .
>
> Sen. Packwood: I would certainly agree with that. I would be terribly disappointed to see a continuation of the restrictive type of certificates that so many carriers have now. . . . [T]he restriction removal section in particular should not be read narrowly. It is meant to be strong and meaningful—and should be implemented at face value.

126 Cong.Rec. S7685 (daily ed. June 20, 1980). Like so much of the bill, the words "reasonably broaden" reflect the delicate compromise that alone made it possible for the Motor Carrier Act to become law. We therefore think, in the words of Senator Packwood, that we are required to take these words at "face value" and enforce them as they are written.[7]

As we pointed out in *American Trucking,* the face value of the "broad qualitative measure" of reasonableness is not immediately apparent. 659 F.2d at 464. Our con-

---

**6.** There is no conference report. The Senate (S. 2245) and House (H.R. 6418) bills were so similar that none was felt to be necessary; therefore, "the House committee report . . . essentially serve[s] as a 'conference report' since the report was reviewed by the Senate prior to its being filed and, indeed, was changed in a number of important respects at the request of the Senate." 126 Cong.Rec. H5345 (daily ed. June 19, 1980) (remarks of Rep. Harsha, cosponsor of the House bill).

**7.** Various comments made during the floor debates, to the extent that they suggest anything to the contrary, do not undermine our analysis. Three comments are urged by Steere to be especially relevant. The first reads:

> It is intended that the removal of these restrictions by the Commission be on a case-by-case basis upon individual carrier application.

clusion, however, that " '[r]easonable' implies that the broadening must be rational, logically supportable and fair" implicitly recognized that the Commission, and not this court, has been entrusted with the primary responsibility of giving more precise meaning to the command, "reasonably broaden."[8] We think that this is exactly what Congress intended.

### III

We are required to approve the Commission's determinations if we find that they are based on substantial evidence in the record and on a view of the statute that is neither arbitrary nor capricious. *See* Administrative Procedure Act § 10(e)(2), 5 U.S.C. § 706(2) (1976); *Steere Tank Lines, Inc. v. ICC,* 687 F.2d 104, 105–06 (5th Cir. 1982) (collecting authorities). *Cf. Schweiker v. Grey Panthers,* 453 U.S. 34, 44, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981) ("[O]ur task is the limited one of ensuring that the Secretary did not 'excee[d] his statutory authority' and that the regulation is not arbitrary or capricious."). In interpret-

> One example of this relates to commodity restrictions. ICC certificates specify in detail the commodities a carrier is authorized to haul. Those restrictions sometimes follow no logical pattern and serve no apparent purposes. This provision would allow the ICC to reasonably broaden, and I repeat, reasonably broaden the categories of commodities which a carrier is authorized to transport. This provision is not intended to give [the] ICC the authority to generalize or standardize all commodity descriptions. It is intended to benefit individual carriers and shippers where such benefits can be proven.

126 Cong.Rec. H5347 (daily ed. June 19, 1980) (remarks of Rep. Harsha, cosponsor of the House bill). This comment must be viewed in the context of the entire legislative history, including the hearings. It refers to something very specific, which Steere, in quoting it, has not seen fit to mention—master licensing or a nonadjudicative restriction removal proceeding, neither of which occurred in this case. *See Hearings on S. 2245,* pt. 5, *supra,* at 1857 (remarks of ICC Chairman Gaskins, proposing master licensing or non-case-by-case restriction removal procedures in his specific comments on § 6 of the bill). *Cf.* MCA § 5, 49 U.S.C. § 10922(b)(3); H.R.Rep. No. 1090, *supra,* at 15, 1980 U.S.Code Cong. & Ad.News at 2297 ("The purpose of this provision is to ban the use of the so-called master certificate approach to granting certificates.").

The second comment is a colloquy that never actually took place on the House floor. (Its principal author was "given permission to revise and extend his remarks.") Though long, it is all to the effect that "there is no intent, . . . in granting the ICC authority to remove unreasonable and excessively narrow artificial restrictions, to extend to the Commission the authority to change substantially the character or pattern of service provided by any carrier." 126 Cong.Rec. H5410 (daily ed. June 19, 1980) (unspoken remarks of Rep. Shuster). Even assuming for the sake of argument that this statement accurately characterizes the purpose of section 6, we do not think that it could apply to the present case. In granting Chemical Ex-

press's restriction removal application, the Commission clearly has *not* "change[d] substantially the character or pattern" of the company's service. *See* note 11 *infra* and accompanying text.

A third comment also may not have been actually read on the House floor. It was made by Representative Howard in response to a question from Representative Shuster: "It should be stressed that if the carrier seeks a fundamental change in his certificate, his remedy clearly lies elsewhere, namely, in applying for new or expanded authority." *Id.* Again, we think that this statement, even if accurate, cannot apply to the present case because the Commission's action below has not "fundamentally change[d]" Chemical Express's operations. *See* note 11 *infra* and accompanying text.

In arguing that the present case *does* rise to the "fundamental change" level, Steere insists that Chemical Express's application should have been brought under section 5 (new certificate applications), rather than section 6 (restriction removals). For the reasons indicated in this opinion, we simply disagree.

8. *See* Note, *Teamsters, Truckers, and the ICC: A Political and Economic Analysis of Motor Carrier Deregulation,* 17 Harv.J. on Legis. 123, 151 (1980) (concluding that under the vague tests given in S. 2245 "the Commission is largely left free to continue its reforms"). The Commission's judgment is, of course, constrained by the limitations we established in *American Trucking, supra,* and in the resulting mandamus opinion, *supra.* The Commission, on the other hand, has stated that "no consideration of [Chemical Express's] fitness to conduct these [broadened] operations is required by the plain language" of section 6. Commission's Brief at 23. The quoted section of the Commission's brief is, at best, equivocating and, at worst, in conflict both with our holding in *American Trucking,* 659 F.2d at 464, and with our holding in the mandamus opinion that followed, 669 F.2d at 962.

ing the law in the case before us, we believe that the Commission has stayed well within the bounds of its statutory authority and has firmly supported its findings with substantial evidence.

We must, moreover, review the Commission's decision in light of the deliberately broad discretion given the Commission through the imprecise statutory command to broaden certificates "reasonably." According to the standard established in *American Trucking,* the Commission's decision need be no more than "rational, logically supportable and fair." 659 F.2d at 464.

■ The threshold issue is whether our review should proceed on a certificate-by-

certificate basis or whether we should consider the Commission's order in its entirety, as it affects all fifty-six of Chemical Express's present certificates. Steere argues, in essence, that section 6 requires both this Court and the Commission to review applications entirely on a certificate-by-certificate basis, and that the Commission therefore erred when it took into account all of the authority Chemical Express had when, for instance, it broadened "salt" to "commodities in bulk and chemicals and related products." [9] We reject Steere's suggested approach.

Like the Commission, we choose to look at all of Chemical Express's application, not

9. The change in language here comes from reading together two Commission publications, *Ex Parte No. MC–142 (Sub-No. 1), Removal of Restrictions from Authorities of Motor Carriers of Property,* 132 M.C.C. 374 (1980) (codified at 49 C.F.R. § 1137.21 (1981)), and *Ex Parte No. 55 (Sub-No. 43A), Acceptable Forms of Requests for Operating Authority,* 364 I.C.C. 432, 457 (1980) (list of 29 recommended commodity descriptions). Guideline 1137.21 recommends that restriction removal applicants choose from among the twenty-nine headings given in the *Acceptable Forms* list; since salt is a chemical, and since Chemical Express already had authority to carry it in bulk, the Commission approved the two broad categories of "chemicals and related products" and "commodities in bulk" for Chemical Express's new certificate.

This court has already passed upon the Commission's use of the above two publications. *See Steere Tank Lines, Inc. v. ICC,* 666 F.2d 255 (5th Cir.1982), *petition for cert. filed,* 51 U.S.L.W. 3013 (U.S. July 9, 1982) (No. 82–41); *American Trucking Associations, supra; see also Ritter Transportation, Inc. v. ICC,* 684 F.2d 86 (D.C.Cir.1982) (following *American Trucking*), *petition for cert. filed,* 51 U.S.L.W. 3305 (U.S. Oct. 19, 1982) (No. 82–594). In *American Trucking,* we held that the Commission could not expand certificates without finding that the applicant was "fit, willing, and able" to provide the new service. (The requirement that every common carrier be "fit, willing, and able" to perform the services authorized in its certificates comes from what is now 49 U.S.C. § 10922(b)(1)(A) (Supp. IV 1980)). The courts in *Steere* and *Ritter Transportation* both remanded in light of *American Trucking* because it appeared that the Commission had failed to consider whether the applicants in those two proceedings were fit, willing, and able to provide the expanded services for which they had requested authority. It is important to note, however, that no party has raised the issue of

fitness, willingness, and ability in the present case. Steere has presented it neither before the Commission below nor before us on this appeal. This court is consequently the first to reach the question of whether—quite apart from the fit, willing, and able determination—the Commission's certificate expansions from individual commodities (such as salt) to broad categories (such as "chemicals" or "commodities in bulk") is "reasonable" within the meaning of section 6 of the Motor Carrier Act of 1980.

Steere strongly urges that we are required to rule against the Commission because its decision was partly based on guidelines that we invalidated on other grounds in *American Trucking, supra.* We disagree. First, we expressly limited our decision in the two *American Trucking* cases to restriction removal proceedings concluded after the date of the two opinions, and the certificate at issue in the present case was issued in June, 1981, well before the date of either decision. *See* 669 F.2d at 960. Second, we indicated in the first *American Trucking* case that our dissatisfaction with the Commission's guidelines and rules principally concerned the fit, willing, and able issue, which does not enter into the present case. *See* 659 F.2d at 475. And third, a party may not challenge an order issued under a possibly invalid rule unless the party has been thereby prejudiced, *see, e.g., Pasco, Inc. v. FEA,* 525 F.2d 1391, 1404–05 (Em.App.1975), and, as we have already noted, Steere has suffered no prejudice from the fact that the Commission's order in the present case predated our decision in *American Trucking;* rather, the prejudice to Steere that forms the basis for the present suit arises out of the Commission's wide reading—apart from the "fit, willing, and able" determination—of its statutory mandate to broaden certificates "reasonably." We address that issue for the first time in the rest of this opinion.

just that part concerning "salt" or any other individual authority. The Commission's action must be viewed as a whole. *See Green Field Transport Co.*, 132 M.C.C. 485, 490–91 (1981) (looking at all of applicant's present certificates in restriction removal section of new entry proceeding), *aff'd sub nom. Refrigerated Transport Co. v. ICC*, 673 F.2d 1196 (11th Cir.1982). This court has already adopted this approach in new entry proceedings under section 5 of the Act, 49 U.S.C. § 10922(b)(1), and—at least on this issue—we can see no principled basis for distinguishing section 5 from section 6. *See Provost Cartage, Inc. v. ICC*, 686 F.2d 221, 224 (5th Cir.1982) (examining all of carrier's "numerous existing certificates" in § 5 case). *See also Baggett Transportation Co. v. United States*, 666 F.2d 524, 527 (11th Cir.1982) (same). The issue is not just "salt," but rather Chemical Express's *entire* application and existing authority.[10]

A review of Chemical Express's existing authority makes it clear that the company is already experienced in the transport of a wide variety of building materials, commodities in bulk, and chemicals and related

products.[11] The Commission concluded, and we think correctly, that "[i]nasmuch as applicant holds numerous certificates authorizing the transportation of a wide variety of named commodities in bulk, in tank vehicles, applicant's proposal is reasonable and well within the scope of the restriction removal rules." *Chemical Express Carriers, Inc., supra*, Sub. 111, at 2. Under the facts of this case, and taking into account our responsibility to review all of the Commission's decision in light of the text and intent of the statute, we think that there can be no real question that the Commission has remained within the bounds of the standard of reasonableness given in section 6 of the Act. The Commission's broadening is clearly "rational, logically supportable and fair." *American Trucking, supra*, 659 F.2d at 464.

The elimination of overly narrow descriptions such as "salt" is, furthermore, precisely what Congress intended when it enacted the Motor Carrier Act. As Senator Cannon remarked when he introduced the bill,

> [t]he "free" entry process has resulted in the following typical examples of com-

**10.** We note parenthetically that the present case does *not* involve a nationwide grant of authority for the transport of commodities in bulk, building materials, and chemicals and related products. The certificate at issue here retains all of the geographical restrictions present in the original fifty-six certificates, except that plant authority has been replaced with county authority. The Commission has fully complied with its statutory mandate to decide restriction removal cases on a case-by-case basis.

**11.** The following list of commodities that Chemical Express is authorized to haul, taken from Chemical's brief, is worth reproducing in full:

> cement; cement in bulk; cement in packages; concrete mix, dry, in bags; fly ash; dry fertilizer and dry fertilizer ingredients, in bulk; new catalyst, in bulk, in covered hopper vehicles; spent catalyst, in bulk, in covered hopper vehicles; sulphate of alumnina, in bulk, in hopper vehicles; silicate of soda, in bulk, in tank vehicles; silicate of soda briquettes, in bulk; catalyst, in bulk; carbon black, in bulk; silica gel catalyst, in bulk, in hopper-type vehicles; plastic pellets (polyethylene), in bulk, in hopper-type vehicles; soda ash, in bulk, in hopper-type vehicles; limestone, in bulk, dry, in tank vehicles;

> feldspar, in bulk, dry, in tank vehicles; fluorspar, in bulk, dry, in tank vehicles; salt cake, in bulk, dry, in tank vehicles; salt; lime in bulk, dry, in tank vehicles; feed ingredients (except salt), in bulk, dry, in tank vehicles; feeds, in bulk, dry, in tank vehicles; cottonseed meal, in bulk, dry, in tank vehicles; soy bean meal, in bulk, dry, in tank vehicles; fertilizer, in bulk, dry, in tank vehicles; sulphur, in bulk, dry, in tank vehicles; ground clay, in bulk, dry, in tank vehicles; mud compounds, in bulk, dry, in tank vehicles; plaster material, in bulk, dry, in tank vehicles; barite ore (barytes), in bulk, in tank or hopper-type vehicles; clay, clay products, and pozzolanic materials, in bulk; sand, in bulk; asphaltic roofing materials; liquid asphalt and asphaltic products, in bulk, in tank vehicles; lime; corn products and soy bean products (except animal and poultry feed and feed ingredients, flour, and vegetable oils and vegetable oil products) in bulk; dry chemicals; gasoline; motor fuel; casing head gasoline; motor fuel gasoline; petroleum products; doors, glazed windows, plywood, molding, window frames and parts thereof, window glass and plate glass, empty containers, store fixtures, and insulation board, jet fuel and motor fuel.

mon carrier authority; the right to transport: oyster shells and calcium carbonate from Baltimore, Md., and Mobile, Ala. to points in Michigan; pulverized agricultural limestone from the facilities of Martin Limestone, Inc., located in Lancaster County, Pa., to points in Delaware, Maryland, New Jersey, and Virginia .... What [carriers] have learned to apply for is operating authority that will not divert traffic from existing carriers; that is, will not increase competition by increasing the number of carriers offering similar service on particular routes.

126 Cong.Rec. S3633–34 (daily ed. Apr. 15, 1980). Congress has unequivocally announced its "strong belief that increased competition and potential competition will bring about the most efficient and economical delivery of transportation service to the public." H.R.Rep. No. 1069, *supra,* at 14, 1980 U.S.Code Cong. & Ad.News at 2296. *See also* S.Rep. No. 641, *supra,* at 7, 25 (purpose of restriction removal is to eliminate "inflated transportation costs to the ultimate consumer"); H.R.Rep. No. 1069, *supra,* at 3, 1980 U.S.Code Cong. & Ad. News at 2285 (same). Even if our standard of review were not limited, and even if we were inclined to accord the Commission's judgment no deference at all, we would be hard pressed, under the facts of this case, to find that the Commission had strayed from its statutory mandate.

The decision of the Commission is therefore

AFFIRMED.