GLOBAL VAN LINES, INC., Wheaton Van Lines, Inc., and Freight Forwarders Institute, Petitioners,

v.

INTERSTATE COMMERCE COMMISSION and The United States of America, Respondents.

No. 82–4284.

United States Court of Appeals, Fifth Circuit.

Sept. 19, 1983.

Alan F. Wohlstetter, Washington, D.C., for Global Intern. U.S.A., Inc., Furniture Forwarding, Inc. & American Movers Conference.

John J. Powers, III, Kenneth P. Kolson, Dept. of Justice, Laurence H. Schecker, L. Carol Brooks, Washington, D.C., for respondents.

Before BROWN, REAVLEY and RANDALL, Circuit Judges.

RANDALL, Circuit Judge:

We have twice recently had occasion to examine the Interstate Commerce Commission's newly promulgated restriction removal rules.[1] Today we examine those rules for the third time, and decide that the Commission may not extend them to cover freight forwarders solely on the authority of its general rulemaking powers. 49 U.S.C.A. § 10321(a) (West Supp.1983). Because we refuse to consider whether the Commission also could have relied upon its conditioning powers, 49 U.S.C.A. § 10923(d)(1), we need not and do not decide whether the regulations, had they been properly promulgated, could be considered arbitrary or capricious. *Freight Forwarder Restrictions (Ex Parte No. MC–142 (Sub-No. 2)),* 132 M.C.C. 832 (1982), is therefore reversed.

---

1. *Steere Tank Lines v. ICC,* 694 F.2d 413 (5th Cir.1982); *American Trucking Ass'ns, Inc. v. ICC,* 659 F.2d 452 (1981), *clarified and enforced through mandamus,* 669 F.2d 957 (5th Cir. 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1272, 75 L.Ed.2d 493 (1983); *see also Steere Tank Lines, Inc. v. ICC,* 666 F.2d 255 (5th Cir.1982) (remanding in light of *ATA* ), *cert. denied,* —— U.S. ——, 103 S.Ct. 1264, 75 L.Ed.2d 499 (1983).

### I

The Motor Carrier Act of 1980 substantially deregulated the American trucking industry. *See* Motor Carrier Act of 1980, Pub.L. No. 96–296, 94 Stat. 793 (codified in scattered sections of 49 U.S.C.). The essential question the parties have asked us to resolve is what this means for freight forwarders.

The relationship between freight forwarders and motor carriers is close. A "freight forwarder," according to the statutory definition, does not use its own equipment, but rather "assembles and consolidates ... shipments and performs or provides for break-bulk and distribution operations of the shipments" in equipment operated by other licensed carriers.[2] Forwarders specialize in the transportation of small shipments, "and derive their income from the difference, or spread, between the carload, truckload, or volume transportation charges they pay to the underlying common carrier and the higher rates paid to them by shippers for the transportation of their individual shipments." *Investigation into the Status of Freight Forwarders (Ex Parte No. 266)*, 339 I.C.C. 711, 713 (1971). Though in a sense merely administrative, forwarders' duties are actually quite far-reaching. A forwarder operates according to published tariffs, issues its own bills of lading, and bears the ultimate responsibility for loading and unloading and for the payment of claims to dissatisfied customers. 339 I.C.C. at 713–14. The Commission has concluded that "[t]he principal characteristic distinguishing freight forwarders from other common carriers is that they themselves may not perform the actual line-haul movement of the goods." 339 I.C.C. at 714. The respective responsibilities of freight forwarders and motor carriers are otherwise very similar. *See also Astron Forwarding Co. v. ICC*, 711 F.2d 391, 392 (D.C.Cir.1983).

Like the much larger trucking industry, the freight forwarding industry has long been forced to operate under a far-reaching and restrictive statutory scheme. The Motor Carrier Act of 1980 altered, but did not remove that scheme.[3] Freight forwarders are still required to obtain permits for every service they offer to the public, 49 U.S.C.A. § 10923(b), and the service actually rendered then may not exceed the commodity, geographic, or other restrictions set out in the permit, 49 U.S.C.A. § 10923(c)(3), (d)(1). Under the regulatory climate generally prevailing after 1957 but before the 1980 improvements, these licensing restrictions often led to inefficient, gerrymandered service and to higher transportation costs for consumers. *See Freight Forwarder Restrictions, supra*, 132 M.C.C. at 839–42 (describing inefficiencies); *Status of Freight Forwarders, supra*, 339 I.C.C. at 726–27, 798–99 (describing 1957 amendments). The trucking industry was in even worse shape. Licensing requirements for motor carriers were considerably stiffer than they were for freight forwarders, *see*

---

**2.** The full text reads:
In this subtitle—
. . . .
(9) "freight forwarder" means a person holding itself out to the general public (other than as an express, pipeline, rail, sleeping car, motor, or water carrier) to provide transportation of property for compensation and in the ordinary course of its business—
(A) assembles and consolidates, or provides for assembling and consolidating, shipments and performs or provides for break-bulk and distribution operations of the shipments;
(B) assumes responsibility for the transportation from the place of receipt to the place of destination; and
(C) uses for any part of the transportation a carrier subject to the jurisdiction of the Interstate Commerce Commission under subchapter I, II, or III of chapter 105 of this title.
49 U.S.C.A. § 10102(9) (West Supp.1983). The three cross-references in subsection "C" refer, respectively, to rail, railwater, express, and pipeline carriers; motor carriers; and water carriers.

**3.** The Motor Carrier Act of 1980 effected a compromise between those who hoped to retain the then present regulatory system and those who wanted to abolish regulation altogether. *See* S.Rep. No. 641, 96th Cong., 2d Sess. 2 (1980) ("The bill represents a middle ground between continuing the status quo, on the one hand, and total deregulation, on the other hand.").

339 I.C.C. at 799, and the permits issued were correspondingly narrower. *See Steere Tank Lines, Inc. v. ICC,* 694 F.2d 413 (5th Cir.1982). One of the four principal improvements wrought by the 1980 Act, the enactment of the restriction removal provisions set out in section 6, was designed to remedy this situation, but referred only to motor carriers, not freight forwarders. *See* MCA § 6, 49 U.S.C.A. § 10922(i). Under section 6 and the accompanying rules, 49 C.F.R. § 1165 (1982), a motor carrier may petition to have commodity, geographic, and similar restrictions removed from certificates it already holds without going through the new licensing procedures specified in section 5 of the Act, 49 U.S.C.A. § 10922(b). *See Steere Tank Lines, supra,* 694 F.2d at 415–18 & n. 7. There is no corresponding restriction removal provision for freight forwarders.

The Commission has nevertheless drawn the commonsense conclusion that "it would be an anomaly to allow motor carriers to broaden their authorities pursuant to the simplified procedures in [what is now] 49 C.F.R. § [1165], but not to allow freight forwarders, a major group of users of motor carrier service, similarly to broaden their respective authorities." 132 M.C.C. at 842. Implicit in this statement is the belief that Congress could not have intended to institute a much-needed reform for motor carriers without providing for the corresponding application of that reform to freight forwarders, or, in the Commission's words, "[i]nasmuch as Congress has declared the policy of granting narrowly drawn and restrictive authorities to be outmoded, we conclude that the benefits should accrue to all those carriers which were adversely affected by the now obsolete regulatory philosophy." 132 M.C.C. at 842. What would benefit motor carriers, reasoned the Commission, would surely benefit freight forwarders as well.

The Commission accordingly began the proceedings challenged in the present suit to determine the extent to which the restriction removal rules promulgated for motor carriers pursuant to the express authority granted in section 6 of the Act should (or could) be applied to freight forwarders. See 47 Fed.Reg. 8801 (1982) (notice of proposed rulemaking). The Commission's proposed rule, like the one finally promulgated, did nothing more than add the words "and freight forwarders" to the introductory clause of the motor carrier rule. 132 M.C.C. at 844 (codified at 49 C.F.R. § 1165.1 (1982)). Various comment-makers—including the petitioners before us today—challenged both the Commission's authority to issue the regulations and their content. The Commission rejected both attacks in its *Freight Forwarder Restrictions* decision, and various representatives of the freight forwarder industry have duly perfected a petition for review under 28 U.S.C. §§ 2321, 2342 (1976 & Supp. V 1981).

We decide only the question of the Commission's authority. We consider first the Commission's rulemaking powers under the motor carrier restriction removal provision (49 U.S.C.A. § 10923(i)), under the national transportation policy section (49 U.S.C.A. § 10101), and under the general rulemaking section (49 U.S.C.A. § 10321(a)). We then consider counsel for the Commission's belated attempt to rely upon the conditioning powers in 49 U.S.C.A. § 10923(d)(1).

## II

In both its notice of proposed rulemaking and its final decision, the Commission relied upon the national transportation policy, motor carrier restriction removal, and general rulemaking sections of the Interstate Commerce Act. We think that none of these sections provides the requisite authority for the extension of the restriction removal rules to freight forwarders.

The arguments based upon the motor carrier restriction removal provision, MCA § 6, 49 U.S.C.A. § 10922(i), and the additions to the national transportation policy section made by the Motor Carrier Act of 1980, MCA § 4, 49 U.S.C.A. § 10101(a)(2), are the most easily disposed of. We have already exhaustively examined the specific terms and legislative history of both sections, and have no trouble in

concluding that they apply only to motor carriers, not freight forwarders. Section 6 is entitled "Removal of Certain Restrictions on Motor Carrier Operation" and amended the section of the codified Interstate Commerce Act entitled "Certificates of motor and water common carriers"; similarly, the addition to the Act made in section 4 begins with the words "with respect to transportation of property by motor carrier . . . ." *See Steere Tank Lines, supra,* 694 F.2d at .415–18. Both provisions evince a congressional concern for efficiency and an end to overly restrictive regulation, but neither says anything about why no analogous provision was enacted for freight forwarders.[4]

The argument based upon the other provisions of the national transportation policy section and on the Commission's general rulemaking power requires a somewhat more extended discussion, particularly in light of the Commission's repeated reference to what has been called the "modern" view of administrative rules enabling provisions.

■ We begin, as we must, with the text of the Interstate Commerce Act, with its legislative history, and with our recent decision definitively interpreting it in a different, but closely related context. The modern and streamlined text of 49 U.S.C.A. § 10321(a) supersedes six different sections of the old arrangement of the Interstate Commerce Act, but is so elliptical as to be of virtually no direct assistance to us today:

> The Interstate Commerce Commission shall carry out this subtitle. Enumeration of a power of the Commission in this subtitle does not exclude another power the Commission may have in carrying out this subtitle. The Commission may prescribe regulations in carrying out this subtitle.

49 U.S.C.A. § 10321(a). *See Central Forwarding, Inc. v. ICC,* 698 F.2d 1266, 1274 n. 11 (5th Cir.1983) (setting out for the "avid reader" the text of the six predecessors of 49 U.S.C.A. § 10321(a)). For our purposes, section 10321(a) may be considered to have originated in just one provision of part IV of the old arrangement of the Interstate Commerce Act:

> It shall be the duty of the Commission to administer the provisions of this part [dealing with freight forwarders], and to that end it shall have the authority to make and amend such rules and regulations and to issue such orders as may be necessary to carry out its provisions.

Interstate Commerce (Freight Forwarder) Act, pt. IV, ch. 318, § 403(a), 56 Stat. 284, 285 (1942) (superseded 1978). This language is much more revealing. It indicates that the Commission is authorized to issue only "such rules and regulations . . . as may be necessary to carry out [the other] provi-

---

4. The legislative history of the Act sheds no further light on the question. *See Economic Regulation of the Trucking Industry: Hearings before the [Senate] Comm. on Commerce, Science, and Transportation . . . on S. 2245,* 96th Cong., 2d Sess., pt. 5 (1980) (only hearing on bill that became the Act); H.R.Rep. No. 1069, 96th Cong., 2d Sess., *reprinted in* 1980 U.S. Code Cong. & Ad.News 2283; S.Rep. No. 641, *supra* note 3; 126 Cong.Rec. S7684–87 (daily ed. June 20, 1980); 126 Cong.Rec. H5339–5424 (daily ed. June 19, 1980); 126 Cong.Rec. S3576–3647 (daily ed. Apr. 15, 1980). The Commission suggests that Congress may simply have overlooked freight forwarders because while there are approximately 17,000 motor carrier companies subject to ICC regulation, there are only some 250 freight forwarders. There also seems to be a significant possibility that the omission may have been deliberate, in that several parts of the Act deal expressly with freight forwarders, *see* MCA §§ 10(d), 11,

22 (codified at 49 U.S.C. §§ 10766(b), 10708, 10703), and in that the Freight Forwarders Institute told Congress that it was "very pleased that those who drafted the bill treated both motor carriers and freight forwarders exactly the same" in those three respects. *Hearings, supra,* at 1886 (statement of Giles Morrow, President, Freight Forwarders Institute). Given the circumstances surrounding the passage of the 1980 Act, *see Steere Tank Lines, supra,* 694 F.2d at 416–18 & n. 7, we refuse to draw any inferences whatsoever, negative or positive, from Congress's failure to enact a restriction removal provision for freight forwarders. *See Helvering v. Hallock,* 309 U.S. 106, 119–20, 60 S.Ct. 444, 451–52, 84 L.Ed. 604 (1940) ("To explain the cause of non-action by Congress when Congress itself sheds no light is to venture into speculative unrealities."); H. Hart & A. Sacks, *The Legal Process* 1394–1401 (tent. ed. 1958) (same).

sions" of the Freight Forwarder Act of 1942. The section has no independent existence; without those other provisions, it means virtually nothing. We think that the express language of the statute admits of no other interpretation.[5]

■ Our precedents also mandate this conclusion. In *Central Forwarding, supra,* 698 F.2d at 1266, we examined section 10321(a) to determine if it could be read in such a way as to authorize the Commission to regulate fuel surcharges in truck leases privately negotiated between the big motor carrier companies and the " 'independent truckers' of song and legend." 698 F.2d at 1267. We concluded that it could not because "the general rulemaking provision imparts power to the ICC only to enforce and carry out the specific substantive man-

dates enacted by Congress." 698 F.2d at 1278. This conclusion is both sound and binding upon us today.

■ The "national transportation policy" section of the Interstate Commerce Act, 49 U.S.C.A. § 10101, does not change this result. Even on its face, section 10101 is nothing more than a more elaborate version of the usual "whereas"-type clauses inserted at the beginning of many acts and proclamations for the general guidance of the courts and others charged with interpreting them. We see no point in repeating the lengthy discussion of section 10101 already undertaken in *Central Forwarding, supra,* 698 F.2d at 1283–84. Suffice it to say here that we agree that section 10101 is not an independent "source of rulemaking power,"

---

**5.** The legislative history reinforces this conclusion. The enacted section 403(a) was intended to give the Commission "authority to make and amend such general or special rules and regulations and to issue such orders as may be necessary to carry out [the Act's other] provisions," S.Rep. No. 132, 77th Cong., 1st Sess. 5 (1942); *accord,* H.R.Rep. No. 1172, 77th Cong., 1st Sess. 8 (1941), and was taken verbatim from section 304(a) of the Water Carrier title of the Transportation Act of 1940. *See Regulation of Freight Forwarders: Hearings before the [House] Comm. on Interstate and Foreign Commerce . . . on H.R. 3684,* 77th Cong., 1st Sess. 130–31 (1941) (written comments of ICC on preliminary draft of Act) (referring to Transportation Act of 1940, ch. 722, sec. 201, § 304(a), 54 Stat. 898, 933 (superseded 1978)). Section 304(a) was in its turn taken verbatim from a draft Water Carrier Act prepared in 1934 by President Roosevelt's Federal Coordinator of Transportation, Commissioner Joseph B. Eastman. *See Regulation of Transportation Agencies,* S.Doc. No. 152, 73d Cong., 2d Sess. 333, 335 (1934) (text of the bill). Commissioner Eastman explained that this section "correspond[s], so far as [it] appl[ies] to common carriers [by water], with similar provisions in the present Interstate Commerce Act." *Id.* at 42. The House report accompanying the 1940 Act elaborated:

This title of the bill . . . amends the Interstate Commerce Act by adding at the end thereof a new part III providing for the regulation of domestic water transportation. . . .

Most of the regulatory provisions included in the new part III were modeled on provisions of part I dealing with the same subject. However, it was found that the provisions of part I were, in many cases, unnecessarily repetitious, and in many cases not logically

arranged. Much unnecessary language was omitted or condensed, and some provisions were rearranged, in the drafting of the provisions of part III. It seems desirable to state this in order that undue significance, from the standpoint of their legal effect, will not be attached to these differences in language and arrangement.

H.R.Rep. No. 1217, 76th Cong., 1st Sess. 18–19 (1939).

For further assistance we therefore turn to the original "part I" of the Interstate Commerce Act. Only one provision is relevant:

[T]he Commission hereby created shall have authority to inquire into the management of the business of all common carriers subject to the provisions of this act, and shall keep itself informed as to the manner and method in which the same is conducted, and shall have the right to obtain from such common carriers full and complete information necessary to enable the Commission to perform the duties and carry out the objects for which it was created; *and the Commission is hereby authorized and required to execute and enforce the provisions of this act* . . . .

Interstate Commerce (Cullom) Act, ch. 104, § 12, 24 Stat. 379, 383 (1887) (emphasized clause added by Act of Mar. 2, 1889, ch. 382, sec. 3, § 12, 25 Stat. 855, 858), *reenacted without change,* Act of Feb. 10, 1891, ch. 128, 26 Stat. 743 (superseded 1940). This section has not even the barest hint of an independent grant of substantive power; rather, the section is tied closely and explicitly to the other provisions of the Act, and there is nothing, so far as we are aware, in the legislative history of the Act to the contrary. *See* C. Miller, *The Legislative Evolution of the Interstate Commerce Act* 329–32 (1930) (full compilation of citations to the history).

and that the Commission's contrary reading "would make superfluous much of the rest of the Revised Interstate Commerce Act, with its detailed guidelines and delegations of authority." A general congressional exhortation to "go forth and do good," without more, is not a proper foundation for the sound development of administrative law. 698 F.2d at 1284.

We agree with the petitioners, finally, that there is nothing inconsistent with these conclusions in our own or the Supreme Court's prior interpretations of administrative rules enabling provisions. We recognize at the outset that "[w]here the empowering provision of a statute states simply that the agency may 'make . . . such rules and regulations as may be necessary to carry out the provisions of this Act,'" the so-called "modern view" of such matters requires us to uphold any regulation promulgated thereunder "so long as it is 'reasonably related to the purposes of the enabling legislation.'" *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 369, 93 S.Ct. 1652, 1660, 36 L.Ed.2d 318 (1973) (citations omitted) (upholding truth-in-lending regulations). But in referring to this and several similar statements from other Supreme Court cases, the Commission has torn the language of the Court loose from its moorings in the specific factual setting of each case. We agree with the Seventh Circuit's conclusions that "[t]he 'modern view' is still subject to the well recognized rule that an administrative agency cannot exceed the specific statutory authority granted it by Congress" and that the agency's regulations "'may not exceed a statute or modify its provisions.'" *Atchison, Topeka & Santa Fe Railway v. ICC,* 607 F.2d 1199, 1203 (7th Cir.1979) (citations omitted).

The regulations upheld in *Mourning* and in the other Supreme Court cases cited by the parties were in every case promulgated to further some specific substantive provision of the underlying statute. In *Mourning,* for instance, the Court upheld the four-installment rule in the Federal Reserve Board's Regulation Z because it had been promulgated to prevent merchants from inventing devices to avoid the disclosure requirements set out in other parts of the Truth in Lending Act. 411 U.S. at 367–70, 93 S.Ct. at 1659–1661. In the leading Interstate Commerce Commission case, *United States v. Pennsylvania Railroad (Seatrain),* 323 U.S. 612, 65 S.Ct. 471, 89 L.Ed. 499 (1945), the Court similarly held that the various specific provisions in the Act requiring railroads to provide through service ("interchange") with other carriers could be read with the Commission's general rulemaking authority to require railroads to hand over not just goods, but entire railroad cars to Seatrain vessels waiting at appropriate interchange points. The Court's leading motor carrier opinion undertook a similar analysis. In *American Trucking Associations, Inc. v. United States,* 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953), the Court held that the Commission could use its general rulemaking authority, ch. 498, § 204(a)(6), 49 Stat. 543, 546 (1935) (superseded 1978), to regulate leasing practices that had been developed to undertake wholesale evasion of virtually every substantive provision of the Motor Carrier Act. The Court commented that its function did not "stop with a section-by-section search for the phrase 'regulation of leasing practices' among the literal words of the statutory provisions" and that it would be "an unnatural construction of the Act which would require the Commission to sit idly by and wink at practices that lead to violations of its provisions." 344 U.S. at 309, 311, 73 S.Ct. at 314–315. In every case, the challenged and upheld rules had been promulgated to enforce or carry out specific provisions of an organizing statute.[6] The

---

**6.** *See also American Trucking Ass'ns, Inc. v. Atchison, T. & S.F. Ry.,* 387 U.S. 397, 87 S.Ct. 1608, 18 L.Ed.2d 847 (1967) (ICC's through-service power in section 216(c) of Act sufficient to authorize promulgation of rules concerning not just goods but also transshipment of entire truck-trailers in so-called "piggy-back" or

"TOFC" service for reasons set out in 1953 *ATA* case); *FTC v. Dean Foods Co.,* 384 U.S. 597, 86 S.Ct. 1738, 16 L.Ed.2d 802 (1966) (FTC had standing to petition court of appeals under All Writs Act for a preliminary injunction under section 7 of Clayton Act to preserve status quo pending Commission's final decision on

"modern view" notwithstanding, section 10321(a) may not be read in isolation from the rest of the Interstate Commerce Act. We can do no better than to repeat the conclusion that we have already drawn: "None of these cases suggests that general rulemaking authority empowers an agency . . . to promulgate regulations which run far afield from the specific substantive provisions of the act." *Central Forwarding, supra,* 698 F.2d at 1277 (footnote omitted).

### III

■ Counsel for the Commission also urges us to examine the conditioning power set out in 49 U.S.C.A. § 10923(d)(1).[7] Because the Commission did not mention that section in its notice of proposed rulemaking, because no interested party was ever afforded an opportunity to comment on the Commission's authority under it, and because the Commission's final decision does not cite it, we refuse to consider it and intimate nothing about how we would rule if the question of the Commission's conditioning power were ever squarely presented to us.

■ The informal rulemaking proceedings in the Commission were undertaken pursuant to section 4 of the Administrative Procedure Act, 5 U.S.C. § 553 (1976). Two parts of that section are relevant here: section 4(a)(2) requires an agency to publish a notice of proposed rulemaking that includes a "reference to the legal authority under which the rule is proposed" and section 4(b) requires that the final rules be accompanied by "a concise general statement of their basis and purpose." 5 U.S.C. § 553(b)(2), (c). In the present proceedings, the reference to section 10923(d)(1) appeared for the first time in the Commission's appellate brief. The petitioners were consequently given an opportunity to discuss that provision only in their reply brief and at oral argument. This, we think, is not enough to comply with even the most generous interpretation of the notice requirement in section 4(a)(2).

■ Section 4(a)(2) provides that "[g]eneral notice of proposed rule making shall be

merger under section 7), *legislatively superseded by* 15 U.S.C. § 53(b) (1976); *Pan Am. World Airways, Inc. v. United States,* 371 U.S. 296, 312, 83 S.Ct. 476, 486, 9 L.Ed.2d 325 (1963) (CAB's cease-and-desist power sufficient to authorize divestiture remedy in anticompetitive merger case partly because "where the problem lies within the purview of the Board, as do questions of division of territories, the allocation of routes, and the affiliation of common carriers with air carriers, Congress must have intended to give it authority that was ample to deal with the evil at hand"); *Diefenthal v. CAB,* 681 F.2d 1039 (5th Cir.1982) (CAB's "adequate service" and general rulemaking powers sufficient to authorize promulgation of airline smoking-section rules); *Warner-Lambert Co. v. FTC,* 562 F.2d 749 (D.C.Cir.1977) (FTC's cease-and-desist power sufficient, under reasoning of *Pan Am* case, to support corrective advertising remedy against company that had been running misleading television commercials), *cert. denied,* 435 U.S. 950, 98 S.Ct. 1575, 55 L.Ed.2d 800 (1978). In all of these cases, the agency's authority clearly rested upon *specific* powers granted elsewhere than in the general order and rulemaking powers sections of the agency's governing statute.

*Cf. Global Van Lines, Inc. v. ICC,* 627 F.2d 546 (D.C.Cir.1980) (discussed in *Central Forwarding, supra,* 698 F.2d at 1277 n. 15), *cert.*

*denied,* 449 U.S. 1079, 101 S.Ct. 860, 66 L.Ed.2d 802 (1981).

7. Section 10923(d)(1) provides:

> The Commission may prescribe necessary conditions under which a . . . freight forwarder provides transportation or service. . . . The Commission may prescribe the conditions when the permit is issued and at any time thereafter.

49 U.S.C.A. § 10923(d)(1) (West Supp.1983). The analog of this provision for motor carriers, Motor Carrier Act of 1935, ch. 498, § 208(a), 49 Stat. 543, 552 (current version codified at 49 U.S.C.A. § 10922(g) (West Supp.1983)), has been significantly interpreted on a number of occasions. *See Restrictions on Service by Motor Common Carriers (Ex Parte No. MC–77 (Sub-No. 1)),* 119 M.C.C. 691, 703 (1974) (conditioning power sufficient to support Commission authority to remove certain restrictions in motor carrier certificates); *Motor Service on Interstate Highways—Passengers (Ex Parte No. MC–65),* 110 M.C.C. 514, 528–30 (1969) (same); *Removal of Truckload Lot Restrictions (Ex Parte No. MC–68),* 106 M.C.C. 455, 456, 493 (1968), *aff'd sub nom. Regular Common Carrier Conf. v. United States,* 307 F.Supp. 941 (D.D.C.1969) (three-judge court). All three of these Commission decisions cited and discussed the conditioning authority.

published in the Federal Register ... [and such] notice shall include ... [a] reference to the legal authority under which the rule is proposed." 5 U.S.C. § 553(b)(2). The Senate report on this part of the bill explains that "[a]gency notice must be sufficient to fairly apprise interested parties of the issues involved, so that they may present responsive data or argument relating thereto," and the House report adds that "[t]he required specification of legal authority must be done *with particularity.*" S.Rep. No. 752, 79th Cong., 1st Sess. 14 (1945), *reprinted in Administrative Procedure Act: Legislative History,* S.Doc. No. 248, 79th Cong., 2d Sess. 185, 200 (1946); H.R.Rep. No. 1980, 79th Cong., 2d Sess. 24 (1946), *reprinted in Legislative History, supra,* at 233, 258 (emphasis added). The authoritative and virtually contemporaneous *Attorney General's Manual* also concludes that "[t]he reference [to legal authority] must be sufficiently precise to apprise interested persons of the agency's legal authority to issue the proposed rule." U.S. Dep't of Justice, *Attorney General's Manual on the Administrative Procedure Act* 29 (1947). This is not a case where the defect in the notice specifically required by section 4(a)(2) is merely technical and where interested parties did, in actuality, have a fair opportunity to comment on the relevant aspects of the authority-to-promulgate issue. *See, e.g., Trans-Pacific Freight Conference v. FMC,* 650 F.2d 1235, 1259 (D.C.Cir.1980), *cert. denied,* 451 U.S. 984, 101 S.Ct. 2315, 68 L.Ed.2d 840 (1981). The question of the Commission's authority to promulgate restriction removal rules for freight forwarders was one of the principal issues raised in the proceedings below, *see* 132 M.C.C. at 834–35, and the Commission's failure to articulate the legal basis that its counsel now advances for the rule—the conditioning power in section 10923(d)(1)—effectively deprived the petitioners of *any* opportunity to present comments on what amounts to half of the case. In the absence of the application of some exemption, "notice and comment" rulemaking under section 4 of the APA, 5 U.S.C. § 553, necessarily requires that interested parties be given a fair chance to "comment." None was provided here, and on that ground alone the Commission must be reversed. *See National Tour Brokers Association v. United States,* 591 F.2d 896, 899–900 (D.C.Cir.1978) (reaching same conclusion).

■ The omission of any reference to section 10923(d)(1) in the administrative record also means that the Commission has failed to provide a "concise general statement of [the rule's] basis and purpose." *See* APA § 4(b), 5 U.S.C. § 553(c). According to the Senate Judiciary Committee, this statement may "vary with the rule, but in any case should be fully explanatory of the complete factual *and legal* basis as well as the real object or objects sought." *Legislative History, supra,* at 11, 20 (emphasis added) (reprinting Senate Judiciary Committee Print of June, 1945). Section 4(b), in other words, implicitly incorporates by reference section 4(a)(2), 5 U.S.C. § 553(b)(2), and at the very least requires that the legal grounds upon which the agency thought it was proceeding appear somewhere in the administrative record. A decision of that magnitude should not be left to the imagination of counsel on appeal, for "[t]he purpose of requiring a statement of the basis and purpose is to enable courts, which have the duty to exercise review, to be aware of the *legal and factual framework* underlying the agency's action." *American Standard, Inc. v. United States,* 602 F.2d 256, 269 (Ct.Cl.1979) (emphasis added and citations omitted). The Commission has relied upon its conditioning powers as a basis for restriction removal authority before, and when it has done so, it has done so expressly. *See* note 7, *supra* (citing cases). It has, moreover, been settled for at least forty years that "[t]he grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." *SEC v. Chenery Corp. (Chenery I),* 318 U.S. 80, 87, 63 S.Ct. 454, 459, 87 L.Ed. 626 (1943). Speculations about what might have been good reasons

had the agency only thought of them do not suffice.[8]

Congress has entrusted to the Commission the determination of what section 10923(d)(1) conditions should be imposed upon freight forwarder certificates and when those conditions should be imposed. We may not exercise that power in the first instance. Our power extends only to determining whether the Commission's decisions under section 10923(d)(1) are arbitrary or capricious or not in accordance with law, and here, the Commission has taken no action under that section. We therefore refuse to reach the question whether the Commission could have used section 10923(d)(1) as the basis for its *Freight Forwarder Restrictions* decision. It did not, and our jurisdiction extends no further.

### IV

We conclude that the Commission cannot rely upon the legal authority it directly considered and that its appellate counsel may not rely upon any other authority. We reach this conclusion upon the basis of both the text of the APA and what we perceive to be the important public interest in ensuring that an agency seriously considers whether Congress intended it to exercise a given rulemaking authority before the fact, not afterwards. Any other view would make useful public comment-making impossible,[9] would encourage inadequate substantive and procedural consideration of significant issues at the agency level,[10] and would require the courts of appeals to pass upon legal questions of first impression without the important (and often decisive) assistance of the agency charged with administering the statute in the first place.[11]

We wish, finally, to place our conclusions in proper perspective. We are acutely aware of the difficulties that the Commission is having with its restriction removal program. *See ICC v. Steere Tank Lines, Inc.,* —— U.S. ——, 103 S.Ct. 1264, 75 L.Ed.2d 499 (1983) (White, Powell & Rehn-

---

**8.** *Chenery I* was based upon the proposition that a "determination of policy or judgment" that Congress had entrusted to an agency could not be exercised in the first instance by a court: "For purposes of affirming no less than reversing its orders, an appellate court cannot intrude upon the domain which Congress has exclusively entrusted to an administrative agency." 318 U.S. at 88, 63 S.Ct. at 459. The Court has since extended this holding to informal rulemaking proceedings on the "short . . . and sufficient" ground that "the courts may not accept appellate counsel's *post hoc* rationalizations for agency action." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* —— U.S. ——, 103 S.Ct. 2856, 2870, 77 L.Ed.2d 443 (1983) (citations omitted).

**9.** The notice-and-comment provisions of the APA "enable[ ] the agency promulgating [a] rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated." *Texaco, Inc. v. FPC,* 412 F.2d 740, 744 (3d Cir.1969). If an agency promulgates a rule without affording interested parties a fair opportunity to comment, it deprives itself of that education.

**10.** There is a strong institutional interest in preventing agencies from promulgating inadequately considered rules in the perhaps half-formed belief that the courts will surely think of some way of upholding them. *See, e.g.,* Pedersen, *Formal Records and Informal Rule-*

*making,* 85 Yale L.J. 38, 73–74 (1975) (describing the destructive consequences at the agency level of anything-to-uphold-the-rule judicial reviewing methods).

**11.** This is not a light consideration:

The administrative agency charged with executing a statute has primary responsibility for determining the scope of its authority. A reviewing court may not set aside the agency's interpretation of the statute that authorizes it to act merely because the judges would have interpreted the statutory language differently. When, pursuant to congressional mandate, an agency adopts regulations to implement the statute it is charged with administering, the agency's interpretation of the statute is entitled to even greater weight. Such regulations can be set aside only if the agency has exceeded its statutory authority or if its regulations so far depart from the statutory purpose that they can be stigmatized as "abitrary or capricious," or "an abuse of discretion," or "otherwise not in accordance with law."

*Western Coal Traffic League v. United States,* 694 F.2d 378, 383 (1982) (footnotes omitted), *vacated for en banc reconsideration,* 694 F.2d 398 (5th Cir.1983); *accord, Quarles v. St. Clair,* 711 F.2d 691, 706–708 (5th Cir.1983). A refusal to insist that an agency interpret its own statute before judicial review begins would implicitly violate all of these well-established principles.

quist, JJ., dissenting from denial of certiorari). We have not deliberately sought to add to that burden in reaching our decision today, but we believe our hands to be tied: for reasons that we can only guess at, *see* note 4, *supra,* Congress did not choose to make the motor carrier restriction removal procedures apply to freight forwarders; despite the fact that the Commission has expressly relied upon its conditioning powers on several previous occasions, *see* note 7, *supra,* it manifestly did not rely upon those powers in the rulemaking proceedings below; and the textual commands of the APA concerning notice and a statement of "basis and purpose" are clear and simply cannot be read out of the statute, however fervently the Commission may desire us to do so. Absent some truly extraordinary circumstance that we do not now foresee, we think it beyond our power to do at the appellate level what Congress has explicitly required be done by the Commission.

The petition for review is accordingly GRANTED and the decision of the Interstate Commerce Commission is REVERSED.