WALES TRANSPORTATION, INC. and
Steel Carriers' Tariff Association,
Inc., Petitioners,

v.

INTERSTATE COMMERCE COMMIS-
SION and United States of
America, Respondents.

No. 83–4026.

United States Court of Appeals,
Fifth Circuit.

April 2, 1984.

Rea, Cross & Auchincloss, Thomas M. Auchincloss, Brian L. Troiano, Jr., Washington, D.C., for petitioners.

James D. Porterfield, Pittsburgh, Pa., for intervenor Pittsburgh & New England Trucking Co.

Robert A. Hirsch, Washington, D.C., for intervenor Am Trucking Assoc.

H. Glenn Scammel, John McCarthy, I.C.C., Washington, D.C.

Robert B. Nicholson, Margaret G. Halpern, Attys., Dept. of Justice, Antitrust Div., Washington, D.C., for respondents.

Before WISDOM, REAVLEY and JOHNSON, Circuit Judges.

REAVLEY, Circuit Judge:

Our question is whether the Interstate Commerce Commission has exceeded its delegated statutory authority by promulgating rules dealing with leasing practices of regulated motor carriers and owner-operators.

This petition comes to us under 28 U.S.C. §§ 2321 and 2342(5) (1976 & Supp. V 1981) (review of ICC regulations). We have recently overturned rules in two cases where we found that the Commission's rulemaking was not grounded in authority granted by Congress. *See Global Van Lines, Inc. v. ICC,* 714 F.2d 1290 (5th Cir. 1983) *(Global (5th))* (general rulemaking authority did not allow ICC to extend restriction removal rules to freight forwarders); *Central Forwarding, Inc. v. ICC,* 698 F.2d 1266, 1277 (5th Cir.1983) (general rulemaking authority cannot support ICC's attempts to promulgate regulations that "run far afield from the specific substantive provisions of the act"). We conclude, however, that the relevant regulations here are authorized by the Commission's general rulemaking power, as described in *American Trucking Associations v. United States,* 344 U.S. 298, 73 S.Ct. 307, 97 L.Ed. 337 (1953) *(ATA).* The Commission's order promulgating the rules is sustained.

1. Petitioners are Wales Transportation, Inc. (Wales), an authorized carrier based in Dallas, Texas, and Steel Carriers' Tariff Association, Inc. (SCTA), a ratemaking bureau whose members are iron and steel carriers. American Trucking Associations, Inc., a national organization representing motor carriers, and Pittsburgh & New England Trucking Co., an authorized carrier based in Pittsburgh, Pennsylvania, have intervened in the case. Intervenors adopt the arguments made by petitioners. Consequently, use of the term "petitioners" in this opinion is intended to include intervenors.

Respondent United States shares the Commission's view that (1) Wales is a proper party only as to claims that the Commission acted outside its statutory authority and (2) the regulations under review were promulgated within the Commission's authority. The United States takes no position on petitioners' claim that the rules do not have a rational basis or are arbitrary, capricious, or an abuse of discretion.

The Commission contends that petitioner Wales is not a proper party here as to nonjurisdictional claims because it did not participate as a party in the Ex Parte No. MC–43 (Subd. No. 13) rulemaking. We agree and hold that Wales is a proper petitioner only insofar as it claims that the Commission exceeded its statutory authority.

Under the Administrative Orders Review Act of 1950 (Hobbs Act), only parties may file a petition to review an administrative order in the court of appeals. 28 U.S.C. § 2344 (1976) provides in part:

## I

After giving notice of proposed rulemaking, 46 Fed.Reg. 44013 (1981), the Commission instituted proceedings to modify ICC leasing regulations. With these modifications the Commission attempted "to solve serious and longstanding problems facing owner-operators" and "to assure continued participation by owner-operators in the surface transportation industry." *Lease and Interchange of Vehicles,* Ex Parte No. MC–43 (Sub-No. 13), 132 M.C.C. 916, 917 (1982). Petitioners and intervenors[1] challenge two modified regulations adopted by the Commission. The modified rules, to be codified at 49 C.F.R. §§ 1057.-12(f) and (g), are challenged as exceeding the Commission's authority, *see* 5 U.S.C. § 706(2)(C) (1976), and as being arbitrary, capricious, or an abuse of discretion, *see id.* § 706(2)(A).

The challenged regulations deal with the context of leased motor vehicles. Authoriz-

On the entry of a final order reviewable under this chapter, the agency shall promptly give notice thereof by service or publication in accordance with its rules. Any party aggrieved by the final order may, within 60 days after its entry, file a petition to review the order in the court of appeals wherein venue lies. The action shall be against the United States.

To be an aggrieved party, one must have participated in the agency proceeding under review. *See American Trucking Ass'ns, Inc. v. ICC,* 673 F.2d 82, 84 (5th Cir.1982) (per curiam); *Gage v. United States Atomic Energy Commission,* 479 F.2d 1214, 1218 (D.C.Cir. 1973) (court had no jurisdiction to hear challenges to regulations since petitioners were not parties to rulemaking proceedings).

An exception to this rule exists, however. A person may appeal agency action even if petitioner was not a party to the original agency proceeding "if the agency action is 'attacked as exceeding the power of the Commission.'" *American Trucking Ass'ns, Inc. v. ICC,* 673 F.2d at 85 n. 4 (quoting *Schwartz v. Alleghany Corp.,* 282 F.Supp. 161, 163 (S.D.N.Y.1968)). Thus, Wales is properly before this court on the challenge to the Commission's authority. Petitioner SCTA is a proper party as to all claims, because SCTA participated in the original agency proceeding. We therefore have jurisdiction to review the rules on the merits.

ed carriers [2] that employ the equipment and services of owner-operators are required to enter leases with a minimum duration of 30 days. 49 C.F.R. §§ 1057.11(a), 1057.12(c) (1982). Carriers that enter such leases are called permanent lease carriers.[3] Often, however, after an owner-operator delivers a load of freight to a destination, the permanent lease carrier may not have a load for the owner-operator to transport to the next loading point. To facilitate equipment movement, to optimize efficiency, and to help provide compensation to owner-operators, Commission regulations authorize the permanent lease carrier in effect to sublease the owner-operator's services and equipment to another authorized carrier. 49 C.F.R. § 1057.22. Such trip leases [4] must be executed in the names of the authorized carriers. 49 C.F.R. § 1057.22(e)(1). While the owner-operator is in the service of the trip lease carrier, the latter assumes control of and responsibility for the owner-operator's equipment. 49 C.F.R. § 1057.22(e)(2). The trip lease carrier makes arrangements with the shipper, and negotiates the compensation to be paid the owner-operator. After completion of the trip, the owner-operator submits paperwork to the trip carrier, who then typically sends a check to the permanent lease carrier for the owner-operator's compensation.

The challenged regulations, as amended by Ex Parte No. MC–43 (Sub-No. 13), 132 M.C.C. at 925, 926 (Appendix) (1982) (to be codified at 49 C.F.R. §§ 1057.12(f) & (g)), provide in part:

> (f) *Items specified in lease.*— . . . Except when the violation results from the acts or omissions of the lessor, the authorized carrier lessee shall assume the risks

and costs of fines for overweight and oversize trailers when the trailers are preloaded, sealed, or the load is containerized, or when the trailer or lading is otherwise outside of the lessor's control, and for improperly permitted overdimension and overweight loads and shall reimburse the lessor for any fines paid by the lessor . . . .

> (g) *Payment period.*—The lease shall specify that payment to the lessor under permanent or trip lease to the authorized carrier shall be made by the permanent lease carrier within 15 days after submission of the necessary delivery documents and other paperwork concerning a trip in the service of the authorized carrier. The paperwork required before the lessor can receive payment is limited to log books required by the Department of Transportation and those documents necessary for the authorized carrier to secure payment from the shipper. The authorized carrier may require the submission of additional documents by the lessor but not as a prerequisite to payment. Payment to the lessor shall not be made contingent upon submission of a bill of lading to which no exceptions have been taken. The authorized carrier shall not set time limits for the submission by the lessor of required delivery documents and other paperwork.

Petitioners object to two rule modifications as being in excess of the Commission's authority. First, modified subsection (f) generally places responsibility for assuming the risks and costs of fines on the authorized carrier lessee. The earlier regulation failed to designate where responsibility for paying fines rested.[5] Second, a modifica-

---

2. *"Authorized carrier*—A person or persons authorized to engage in the transportation of property as a common or contract carrier under the provisions of 49 U.S.C. 10921, 10922, 10923, 10928, 10931, or 10932." 49 C.F.R. § 1057.2(a).

3. *"Permanent lease*—A lease in which the authorized carrier acquires the use of equipment, with or without driver, from an owner for a period of 30 days or more." 49 C.F.R. § 1057.-2(f).

4. *"Trip lease*—A lease in which an authorized carrier acquires the use of equipment, with or without driver, from an owner for a period of time less than 30 days." 49 C.F.R. § 1057.2(g).

5. *Items specific in lease*—The lease shall clearly specify the responsibility of each party with respect to the cost of fuel, fuel taxes, empty mileage, permits of all types, tolls, ferries, detention and accessorial services, base plates and licenses, and any unused portions of such items. The lease shall clearly specify who is responsible for loading and

tion of subsection (g) reduces the amount of documentation and other paperwork that a permanent lease carrier can require from an owner-operator as a condition precedent to payment. The earlier rule stated merely that "[t]he lease shall clearly specify the delivery documents and other paperwork that must be submitted before the lessor can receive payment." 49 C.F.R. § 1057.-12(g) (1982). Under the modified regulation, the carrier can condition payment only upon receipt of those documents necessary to secure payment from the shipper and of logs required by the Department of Transportation.

Petitioners also contend that two modifications of 49 C.F.R. § 1057.12(g) are arbitrary, capricious, or an abuse of discretion. In addition to the modification reducing the amount of paperwork that a carrier can require as a prerequisite to payment, petitioners take issue with the reasonableness of the rule that wholly places responsibility on the permanent lease carrier for paying the owner-operator within 15 days after submission of required documentation. The earlier version of subsection (g) did not specify which party was responsible for paying the owner-operator—the permanent lease carrier or the trip lease carrier.

## II

Petitioners' principal attack on the regulations is aimed at the Commission's alleged lack of statutory authority. The Commission relied on its general rulemaking authority recognized and construed by the Supreme Court in *ATA*. Despite the absence in the Motor Carrier Act [6] of any "express delegation of power to control, regulate or affect leasing practices," *ATA*, 344 U.S. at 309, 73 S.Ct. at 314, the Court clearly held that the Commission was authorized to regulate leasing practices by Congress' grant

of general rulemaking power. *Id.* at 312, 73 S.Ct. at 315. *See ICC v. Brannon Systems, Inc.*, 686 F.2d 295, 296 (5th Cir.1982) ("Long settled practice confirms the I.C.C.'s power to regulate equipment leasing in the transportation industry.")

The Commission promulgated the rules reviewed in *ATA* to address "conditions which may directly frustrate the success of the regulation undertaken by Congress." *ATA*, 344 U.S. at 311, 73 S.Ct. at 315. Although the Court recognized that there were limits to the general rulemaking power delegated to the Commission, the Court held that the Commission was clearly within that delegated power to promulgate rules "to protect the industry from practices detrimental to the maintenance of sound transportation services consistent with the regulatory system." *Id.* at 310, 73 S.Ct. at 314, 315. The Court recognized that one of the purposes behind the creation of regulatory agencies is to correct evils that may not be apparent to legislators who draft acts delegating agency powers. *Id.* at 309, 310, 73 S.Ct. at 314. The Court later embraced this principle in *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973) (broad rulemaking authority vested in administrative agencies to achieve flexibility). *See Diefenthal v. CAB*, 681 F.2d 1039, 1043–44 (5th Cir.1982) (absence of express delegation of power to regulate particular area not fatal to regulation's validity so long as regulation reasonably advances purposes of enabling statute).

Petitioners do not deny that the Commission has the power to regulate equipment leasing practices. Instead, they seek to characterize the rules at issue as an invasion into the labor-management area. Petitioners contend that the Commission is attempting by rule to regulate terms of em-

---

unloading the property onto and from the motor vehicle, and the compensation, if any, to be paid for this service.
49 C.F.R. § 1057.12(f) (1982), *amended by* Ex Parte No. MC–43 (Sub-No. 13), 132 M.C.C. 916.

**6.** Act of Sept. 18, 1940, ch. 722, title I, § 15, 54 Stat. 919, changed "Motor Carrier Act, 1935" to part II of the Interstate Commerce Act. The

revised Interstate Commerce Act of 1978, Pub.L. 95–473, § 1, 92 Stat. 1337, restated and enacted without substantive change the Interstate Commerce Act and related laws as subtitle IV of title 49 of the United States Code (Transportation). *See Central Forwarding* at 1274 & n. 10.

ployment as well as working conditions. By intruding into the collective bargaining area, petitioners argue, the Commission has exceeded its statutory authority, requiring us to strike down the rules. Petitioners claim that the Commission, by disguising its rules as regulation of leasing practices, attempts to avoid the impact of *Central Forwarding v. ICC,* 698 F.2d 1266 (5th Cir. 1983).

We disagree. At the outset we described the holding in *Central Forwarding* as "a narrow one, constrained by particular circumstances." *Id.* at 1267. The Commission had attempted to dictate the terms of compensation by requiring carriers to compensate owner-operators for increased fuel costs based on a cents-per-mile formula. We characterized the rule at issue in *Central Forwarding* as direct regulation of private sector compensation. *Id.* at 1272.

Recognizing that the extent of an administrative agency's authority is not always self-evident, we employed a three-part inquiry to answer the ultimate question of whether the Commission's regulation was within authority delegated by Congress: "(1) how broadly has Congress granted rulemaking authority to the agency; (2) how closely related to specific delegations of power is the regulation in question; (3) how dramatically does the regulation affect the private parties at which it is aimed." *Id.* In *Central Forwarding* this mode of inquiry led us to conclude that the general rulemaking authority did not empower the Commission "to promulgate regulations which run far afield from the specific substantive provisions of the act." *Id.* at 1277.

We now apply this mode of inquiry to the present case. To identify the breadth of the Commission's general rulemaking authority it is also necessary to determine the substantive mandates of the Interstate Commerce Act because they define and limit the Commission's power to regulate. We have previously noted that by itself, Congress' grant of rulemaking authority, 49 U.S.C. § 10321(a), "is practically devoid of meaning . . . ." *Central Forwarding,* 698 F.2d at 1274. *See Global (5th),* 714 F.2d at 1294–95. The *ATA* case, however, provides an overlay to the authorizing statute that helps flesh out the statute's contours. "Our reading of *ATA* and related cases is that a general rulemaking provision should be read as a kind of necessary and proper clause. It grants considerable powers to enforce the substantive mandates of federal law governing interstate motor transportation, but is tied to and limited by those specific substantive provisions." *Id.* at 1277.

Congress has authorized the Commission to require motor carriers that lease equipment from owner-operators to enter into written contracts, to specify the compensation to be paid and the duration of the contract, to carry a copy of the contract in the leased motor vehicle, to inspect the leased motor vehicles, to obtain insurance, and otherwise to be responsible for operating the leased vehicles "as if the motor vehicles were owned by the motor carrier." 49 U.S.C. § 11107(a). The 1956 amendment, which essentially codified certain of the regulations upheld in *ATA,* introduced the subject of regulation of leasing practices into the Act for the first time.[7] There

---

**7.** In 1956 Congress amended the Interstate Commerce Act "to address specifically the subject of trip leasing." *Global (DC),* 627 F.2d at 550. The General Statement from House Report No. 2425 provides:

This bill proposes to add to part II of the Interstate Commerce Act a new provision granting specific authority to the Interstate Commerce Commission to exercise certain regulatory authority over the utilization by motor common and contract carriers (under leases, contracts, or other arrangements) of vehicles not owned by them—a practice generally limited to a one-way or round-trip

movement of property in a vehicle leased with driver, and commonly called "trip leasing."

. . . .

The affirmative authority granted to the Interstate Commerce Commission by this legislation will strengthen the Commission's authority to deal with the abuses which have arisen from trip-leasing practices. At the same time, it will assure that motor vehicles which haul agricultural commodities may be leased to authorized motor carriers for a return haul, instead of having such vehicles return empty.

is no indication that Congress intended to undermine *ATA*. *Central Forwarding*, 698 F.2d at 1282. Indeed, the legislative history of the 1956 amendment reveals that limitations were placed only on the Commission's ability to regulate exempt carriers—farmers and other haulers of agricultural and other perishable commodities. *See Global Van Lines, Inc. v. ICC*, 627 F.2d 546, 551 (D.C.Cir.1980), *cert. denied*, 449 U.S. 1079, 101 S.Ct. 860, 66 L.Ed.2d 802 (1981) (*Global (DC)*); H.R.Rep. No. 2425, 84th Cong., 2d Sess. 1, *reprinted in* 1956 U.S.Code Cong. & Ad.News 4304.

■ Moreover, in *Central Forwarding* we rejected an argument that the Commission's ability to regulate leasing practices was limited to those specified in the Act. *Central Forwarding*, 698 F.2d at 1282. We stated that the Commission's authority to regulate leasing practices may be found both in § 11107 and in the Commission's general rulemaking power. *Id.*[8]

H.R.Rep. No. 2425, 84th Cong., 2d Sess. 1, 2, *reprinted in* 1956 U.S.Code Cong. & Ad.News 4304, 4304–05.

8. 49 U.S.C. § 11107(b) (Supp. V 1981) provides:

The Commission shall require, by regulation, that any arrangement, between a motor carrier of property providing transportation subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title and any other person, under which such other person is to provide any portion of such transportation by a motor vehicle not owned by the carrier shall specify, in writing, who is responsible for loading and unloading the property onto and from the motor vehicle.

Petitioners argue that, because § 11107(b) directs that leases between motor carriers and owner-operators specify the allocation of responsibilities for loading and unloading the vehicle, Congress intended to restrict the Commission's ability to direct where certain responsibilities rested. They contend that § 11107(b) manifests an intent to allow the parties, not the Commission, to divide responsibilities.

We responded to a similar argument in *Central Forwarding*. The Motor Carrier Act of 1980 added subsection (b) to § 11107. This amendment was intended to "preclude the use of force or coercion at loading docks" and otherwise remedy "lumping" problems. *See* H.R. Rep. No. 1069, 96th Cong., 2d Sess. 30–31, *reprinted in* 1980 U.S.Code Cong. & Ad.News

The second subsidiary question—the proximity of the regulations at issue to specific delegation of power—has its roots in *Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973), where the Court stated that a regulation promulgated under the empowering provision of a statute "will be sustained so long as it is 'reasonably related to the purposes of the enabling legislation.'" *Id.* at 369, 93 S.Ct. at 1661 (citing *ATA*). *See Global (DC)*, 627 F.2d at 551 ("so long as the regulations can be justified as reasonably related to the purposes of the Act, they cannot be objected to as being outside the Commission's jurisdiction").

■ Although the rules adopted in Ex Parte No. 43 (Sub-No. 13) do not "clearly fall[ ] within the rulemaking prerogatives expressly granted by statute," we find that they bear considerable kinship to the power specifically delegated to the Commission in § 11107.[9] *See Central Forwarding*, 698

2283, 2312–13. We reiterate our response in *Central Forwarding*, where we stated that § 11107(b) was "one small part of a statutory scheme aimed at a very specific problem, and f[ou]nd it inconceivable that this narrow provision excludes other regulation of leasing practices." 698 F.2d at 1282.

9. Sufficient authority for rule promulgation exists in the Commission's general rulemaking power. In *Central Forwarding*, we suggested that it would be inappropriate for the Commission to ground its power to regulate compensation in 49 U.S.C. § 11101(b), which states that the Commission may prescribe requirements for continuous and adequate transportation and service provided by motor common carriers...." 698 F.2d at 1279 ("Commission's power to promote continuous and adequate service does not extend to setting labor compensation levels, but is restricted to setting qualifications for employment and maximum hours."). *Cf. Diefenthal v. CAB*, 681 F.2d 1039, 1043–46 (5th Cir.1982) (statute requiring certified carrier to provide "adequate service," 49 U.S.C. § 1374(a), provides authority for CAB's regulation requiring aircraft to provide no-smoking areas) (cited in *Global (5th)*, 714 F.2d at 1296 n. 6).

Nevertheless, having found sufficient authority elsewhere for the Commission's promulgation of modified regulations, we think that § 11101(b) may serve as a fair indication of the purposes of the Act—maintenance of continu-

F.2d at 1272. Unlike the regulation vacated in *Central Forwarding*, the regulations here can be fairly described as measures "aimed at simply promoting or policing fair dealings among private parties." *Id.*

The regulations are modifications of earlier rules that were clearly promulgated within the Commission's statutory authority. The modified rules represent the Commission's attempts to solve inequities facing owner-operators and to assure their continued participation in the industry. The Commission, by defining more clearly the rights and responsibilities of carriers and owner-operators, sought to foster a better-functioning environment in which enhanced cooperation would reduce the need for courts or the Commission to resolve disputes. 132 M.C.C. at 925 (comments of Commissioner Gradison).

We have approved of a Commission regulation promulgated to achieve the purpose of prompt payment of owner-operators. *See ICC v. Brannon Systems, Inc.,* 686 F.2d 295 (5th Cir.1982). We viewed this goal as consistent with the Commission's "statutory role of promoting an efficient transportation system." *Id.* at 297. We likewise regard the regulation reducing the amount of paperwork that a carrier can demand as a condition precedent to payment of the owner-operator as furthering the goals of prompt payment and efficiency.

The Commission found that "[s]ome carriers have avoided their obligation to pay promptly by specifying unusual types or amounts of paperwork as a condition for payment." 132 M.C.C. at 920. The earlier rule only required that the lease specify whatever documentation the carrier required as a prerequisite to payment. The Commission stated that "Occasionally, carri-

ers have abused their ability to specify paperwork to avoid their obligation to make prompt payments. For example, some carriers are now requiring the submission of a clean bill of lading ... as a prerequisite to payment. This ... should not be permitted, since it allows carriers to withhold payment on shipments where a claim has not yet been and may never be, filed, and where the owner-operator may not be in any way responsible." 46 Fed.Reg. at 44014.

The other regulation challenged as in excess of the Commission's statutory authority places on an authorized carrier lessee the responsibility for assuming the risks and costs of fines for overweight and oversize trailers, except when the owner-operator is at fault. The earlier regulation failed to specify who must bear the cost of fines. The Commission emphasized that "such responsibility rests with the carrier whenever the trailers and/or their lading are outside the control of the lessor [owner-operator]." 132 M.C.C. at 922. To the extent that the regulation resolves uncertainty about where responsibility for paying fines lies, the goals of assuring continued participation by owner-operators and reducing disputes will be furthered. Moreover, we find that this modification of the earlier regulation is consistent with the substantive mandate of § 11107(a)(4), which allows the Commission to require a carrier to have control and be responsible for complying with "applicable law as if the [leased] motor vehicles were owned by the motor carrier."[10] The modified regulation requires the authorized carrier, consistent with its position of responsibility, to pay fines. Thus, the regulation requires the lessee carrier to act as if it owned the leased motor vehicle.

---

ous and adequate transportation and service. The modified regulations, we find, are reasonably related to these purposes.

**10.** 49 U.S.C. § 11107(a)(4) provides:
 (a) Except as provided in section 11101(c) of this title, the Interstate Commerce Commission may require a motor carrier providing transportation subject to the jurisdiction of the Commission under subchapter II of chapter 105 of this title that uses motor vehi-

cles not owned by it to transport property under an arrangement with another party to—
 . . . .
 (4) have control of and be responsible for operating those motor vehicles in compliance with requirements prescribed by the Secretary of Transportation on safety of operations and equipment, and with other applicable law as if the motor vehicles were owned by the motor carrier.

In *Central Forwarding,* we expressed no view as to the correctness of *Global (DC),* but noted that "it may well be distinguishable." *Central Forwarding,* 698 F.2d at 1277 n. 15. In *Global (DC),* the court held "that the ICC had authority under its general rulemaking powers to promulgate a regulation requiring carriers to return escrow deposits to owner-operators within 45 days and pay interest on the deposits at a rate equal to the 91-day Treasury bill rate." *Id.* We stated that the regulation upheld there had "a much less dramatic impact on private parties than the [fuel compensation] regulation," *id.,* and indicated that the *Global (DC)* regulation did not "run far afield from the specific substantive provisions of the act." *Id.* at 1277.

We find that the modified regulations allocating responsibility for payment of fines and reducing the amount of paperwork that can serve as a prerequisite to payment, like the regulation in *Global (DC),* do not dramatically affect "the parties at which [they] are directed." *Id.* at 1272. As modifications of existing regulations, the rules at issue here will not "profoundly affect[ ] all segments of the industry." *Id.* at 1284. Moreover, these regulations do not attempt to enter "whole new horizons on the regulatory landscape." *Id.* at 1277. Instead, they remain within the authorized realm of leasing practices.

█ Petitioners argue that the regulations do not merely regulate leasing practices. Rather, they contend that the regulations are directed at terms of employment and working conditions.[11] As such, petitioners argue, the regulations conflict with existing collective bargaining agreements, disrupt labor relationships, and conflict with and undermine the Labor Management Relations Act.

We have no doubt that these regulations, to some extent, will affect the division of responsibilities between carriers and owner-operators and will reduce the parties' ability to contract. For example, 49 C.F.R. § 1057.12(g) will no longer allow a carrier

to require submission of every piece of paperwork before the carrier is required to pay the owner-operator. Such an effect, however, does not constitute an impermissible intrusion by the Commission into the field of labor-management. Any regulation of leasing practices of carriers and owner-operators possesses the potential for dividing responsibilities and reducing the ability of parties freely to contract, with ensuing economic consequences. It takes a great leap, however, to equate a rule specifying the documentation a carrier may require as a prerequisite to payment with a rule that requires carriers to compensate owner-operators based on a fixed formula or otherwise directly regulates private sector compensation. One of the reasons the Commission exceeded its authority with its compensation regulation in *Central Forwarding* was because the Commission "placed no limits on its power to rethink or recalculate its fuel reimbursement formula in the future, and has thus empowered itself to control compensation in the industry as it wishes." *Central Forwarding,* 698 F.2d at 1271. That simply is not the case here.

The modified regulations no more invade the realm of compensation, labor-management, or private contract than did the regulations approved by the Supreme Court in *ATA.* For example, in *ATA* the Commission had promulgated a rule that required leases between carriers and owner-operators to extend to a minimum duration of 30 days. The Court clearly rejected an argument forecasting that the regulations would result in "[u]nfortunate circumstances . . . because the exempt owner-operator will no longer be able to hire himself out at will." *ATA* 344 U.S. at 318, 73 S.Ct. at 314. We are similarly unpersuaded that dire consequences will ensue because the modified regulations encroach partially on the parties' ability freely to contract.

### III

Petitioners argue that if the challenged regulations represent a valid exercise of the Commission's authority, they are neverthe-

---

11. *See supra* note 8.

less arbitrary, capricious, or an abuse of discretion. *See* 5 U.S.C. § 706(2)(A).

 Petitioners submit that the modified regulation that places responsibility on the permanent lease carrier for payment to the owner-operators is not rationally related to the asserted purpose of securing prompt payment because the previous regulation required payment within the same length of time. Petitioners suggest that, because the Commission could enforce the regulation against either the permanent lease carrier or the trip lease carrier, assignment of payment responsibility to the permanent lease carrier is arbitrary.

This modified regulation is also attacked because the Commission failed to provide a mechanism whereby the permanent lease carrier could secure prompt and full reimbursement from the trip lease carrier. Petitioners claim that at the time payment is required, the permanent lease carrier will not have proof of delivery or other documentation that would verify the amount of compensation actually owed to the owner-operator.

We hold that the Commission's modification of 49 C.F.R. § 1057.12(g) is not arbitrary, capricious, or an abuse of discretion. By specifying that the permanent lease carrier and not the trip lease carrier was the party responsible for payment, the Commission clarified the then-existing rule. Under common practice, the trip lease carrier sends payment, after receiving the trip paperwork from the owner-operator, to the permanent lease carrier. The Commission, however, refused to allow permanent lease carriers to await payment from trip lease carriers before having to pay owner-operators. 132 M.C.C. at 920. Otherwise, owner-operators would be delayed in receiving prompt compensation. As a matter of economic reality, and due to the permanent lease carrier's position as a principal to the contract with the trip lease carrier, the permanent lease carrier has more leverage to extract funds from the trip lease carrier.[12]

The Commission also permits a measure of protection for carriers that wish to avoid dealing with trip lease carriers that may not readily forward proof of delivery or other documentation or otherwise transmit the amount of compensation due the owner-operator. Permanent lease carriers may include in their lease contracts a provision for prior approval, which, if breached, would release permanent lease carriers from their responsibility for payment. Moreover, "[t]he lease can specify to whom the paperwork may be submitted." *Lease and Interchange of Vehicles,* Ex Parte No. MC–43 (Sub-No. 7A).

 Petitioners also claim that the portion of 49 C.F.R. § 1057.12(g) that reduces the documentation that a carrier can demand before paying the owner-operator is arbitrary, capricious, or an abuse of discretion. They object to the absence of a rational basis to support the Commission's decision to allow the submission of certain documents, but not others, to serve as a prerequisite to the permanent carrier's obligation to pay the owner-operator within 15 days.

We regard the Commission's regulation as balancing the permanent lease carrier's need to secure important documents against the delays in payment of owner-operators that would result if carriers could make any document a condition precedent to payment. The Commission's decision to allow carriers to require documents needed to obtain payment from the shipper as well as logs demanded by the Department of

---

**12.** In its rulemaking notice the Commission stated:

> Since the permanent lease carrier is frequently responsible for securing the trip lease and had dealt directly with the trip lease carrier it appears that the permanent lease carrier has more [l]everage than the owner-operator to collect the funds due. We believe that clarification of this rule to specify the obligations of the parties will reduce the need for difficult and costly case-by-case enforcement actions and should facilitate voluntary compliance with the leasing regulations.

46 Fed.Reg. at 44014.

Transportation [13] falls within the "zone of reasonableness." *See American Transfer & Storage Co. v. ICC,* 719 F.2d 1283, 1306 (5th Cir.1983); *Global (DC),* 627 F.2d at, 553 (Commission's decision where to strike balance is essence of administrative discretion).

## IV

■ Intervenors assert that the Commission's regulation that limits the carrier's right to condition payment on the receipt of certain documents violates the due process rights of carriers. Intervenors state that the ability of carriers to comply with certain federal and state laws hinges upon their ability to obtain documents that constitute primary evidence of the carriers' compliance. It is asserted that the Commission's regulation has deprived carriers of their only effective means of obtaining documents.

We do not find that 49 C.F.R. § 1057.-12(g) deprives carriers of due process. The modified regulation merely prevents carriers from conditioning payment upon the receipt of certain documents. Carriers are not prevented from requiring by contract the submission of any needed document or paperwork. Moreover, Commission regulations permit carriers to employ other security mechanisms to insure that owner-operators comply with lease provisions. *See* 49 C.F.R. 1057.12(1).

The Commission's order promulgating the modified regulations is sustained.

PETITION DENIED.

---

**13.** The Commission initially proposed that carriers be allowed to require as a prerequisite to payment only those documents necessary to obtain payment from the shipper. In response to objections and comments voiced by parties during the rulemaking proceeding, the Commission altered the regulation to allow carriers also to require submission of completed log books as a condition for payment. Otherwise, the Commission noted, compliance with Department of Transportation and state regulations would be impossible. 132 M.C.C. at 920. The Commission's responsiveness to comments, we think, indicates that the rule has a rational basis.